[L. A. No. 17309.   In Bank.—December 22, 1939.]

In the Matter of the Petition of FARNESE M. ANDREANI
for Reinstatement to Practice Law.

Harold E. Prudhon for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—This is an application by F. M. Andreani for readmission to practice law in this state. Among other things the record herein discloses that on October 22, 1915, petitioner was admitted to practice law in all the courts of this state; that on or about March 2, 1933, petitioner was ordered to show cause before a local administrative committee of The State Bar why he should not be disciplined for specified professional misconduct, which, in effect, consisted of charging a "highly excessive and unreasonable" fee and of the appropriation to his own use and benefit of moneys belonging to a corporation for which petitioner was acting as attorney; and that following a hearing on such charges the local administrative committee made its findings of fact, upon which it concluded that petitioner had been "guilty of acts of misconduct in violation of rule 9 of the Rules of Professional Conduct of The State Bar of California", also that "the

said acts of misappropriation and embezzlement of the said funds of said corporation and the faliure to pay the said moneys to the said P. D. Estate Company and to the persons lawfully entitled thereto, were knowingly committed by the said respondent attorney as an attorney at law and involve moral turpitude and dishonesty within the meaning of subdivision 5 of section 287 of the Code of Civil Procedure of the State of California''. In pursuance of such findings and conclusions the said committee made its recommendation to the state board of bar governors that petitioner ''permanently be disbarred . . . ''. Thereafter, in due course, the said board approved the findings of fact which theretofore had been made by the committee, and recommended to this court that petitioner be disbarred from the practice of law in this state,—with the result that, in the absence of any contest thereof by petitioner, an order of this court of date December 11, 1933, was made in accordance with said recommendation.

Thereafter, on January 24, 1936, on the filing by petitioner of his application for reinstatement the said board of bar governors denied his petition ''without reference to a Committee for formal hearing and without taking testimony''. On June 14, 1936, petitioner again ''duly and regularly filed his written petition with the said Board of Governors of The State Bar of California, requesting its favorable consideration and recommendation that he be readmitted to The State Bar of California''; and in pursuance thereof, but not until September 8, 1938, a duly appointed committee filed with the said board its report, findings of fact and conclusions thereon, together with its recommendation that petitioner be reinstated as a member of The State Bar. On March 24, 1939, the board of bar governors rereferred the matter to the committee, with special instructions to ''receive all evidence and further testimony which may be presented to it by the Petitioner and the Examiner pertaining to the repayment by Petitioner of his obligations, the rehabilitation of Petitioner and the present attitude of Petitioner with respect to restitution'',—which reference resulted in amended findings and a second recommendation by the committee that petitioner ''be reinstated as a member in good standing of The State Bar of California''. Thereafter, on August 12, 1939, the board of bar governors, ''without taking evidence of any kind other than said Report

of the Administrative Committee, adopted a Resolution whereby the Petition of the said F. M. Andreani for readmission was denied''. On the conclusion thus finally reached by the state board of bar governors, at his request therefor, petitioner has been granted a writ of review; and the matter, which has been briefed and argued by the respective parties, is now ready for determination by this court.

For the reason that after the board of bar governors had made its order recommending petitioner's disbarment the latter voluntarily declined to avail himself of the right to have such proceedings reviewed by this court, and to the end that a fair understanding may be had herein with regard to the facts which form the background of the instant petition, a consideration of the principal incidents which led to the commission of the offense of which petitioner was found guilty are here set forth: At the inception of the legal business which resulted so disastrously as far as he was concerned, petitioner was a practicing lawyer with a rather select clientele, especially among the more prosperous of the foreign population of the city of Los Angeles and its environs. It appears that, prior to the time when petitioner became involved in the instant transaction, two maiden ladies of advanced years, named respectively Francesca and Caledonia Domec, had deeded to their niece, Marie More (reserving unto themselves a life interest therein), a tract of land containing approximately 140 acres. The consideration for such transfer was ''love and affection'', which had accrued throughout the many preceding years during which the niece had lived with her aunts as a member of their household in a house which formerly had been the property of the mother of the niece, long since deceased. Soon after the date of such conveyance, the two Misses Domec began to consult petitioner with regard to their business affairs. They offered to sell the entire acreage to petitioner for the sum of $16,000. He declined the offer, but suggested that they and Miss More form a corporation, to the end that the property might be more expeditiously handled in the event its sale or other disposition were contemplated. Accordingly a corporation known as the P. D. Estate Company was organized, with an authorized capitalization of $50,000, divided into 500 shares of the par value of $100 per share. It appears that petitioner personally paid all fees, costs and expenses of the organization

of such corporation. All the shares of stock of the corporation were divided and distributed,—140 shares to each of the Misses Domec and Miss More, and 80 shares to petitioner, in payment for his services in performing not only the legal work which was required in the organization of the corporation, but also that which thereafter might be required in the conduct of its "business". Each of such stockholders became an officer of the corporation and so remained during all the time here under consideration. It was petitioner's original idea that the property of the corporation advantageously might be subdivided into small parcels which could be sold as cabin sites. Thereupon he bestirred himself to the accomplishment of that purpose, and eventually succeeded in consummating a sale of the property at a price of $84,750. A trust was created which contained a provision to the effect that, as and when sold, a fixed proportion of the sale price of each lot would be paid to the corporation. At or about the same time that the trust agreement was executed, but entirely distinct and separate therefrom, a resolution was regularly adopted by the corporation which provided, in substance, that no funds should be withdrawn from its bank account except by check carrying the signature of both petitioner (as secretary) and Miss More (as treasurer). But also at about that time it was agreed, orally, by at least one of the Misses Domec together with Miss More and petitioner that as moneys were received from the sale of the property of the corporation, such proceeds would be divided among the four stockholders thereof in the respective proportion that the stock of each shareholder bore to the total number of shares of stock of the corporation,—which apportionment of moneys was to be accomplished without and in the absence of the legal formality usually employed by a corporation in the business of declaring a dividend. The evidence does not fully disclose whether both of the Misses Domec were present and agreed to such manner of dividing the assets and profits of the corporation. The one who possibly or probably was absent was quite ill and infirm; but the other Miss Domec, who was able to go about, usually acted as agent for her absent sister and transacted all business in which they were commonly or mutually interested. But, however the facts in that regard may be, it is certain that during a period of five or six years following the date of such oral agreement the plan thereby adopted was carried into execu-

tion, in that as proceeds from the sale of the property were received they were appropriated either by petitioner or by Miss More either to his or her respective personal use, or by a division of such moneys by each of them respectively with either or both of the Misses Domec. In that regard Miss More testified as follows: That " . . . *every* time I got a check I got the money for *them* [her aunts]. I kept some of it as it was agreed that I should keep some"; that it was agreed that her *aunts* should have some; that *Andreani* should have some, and that *she* should have some; that it also was agreed that "it should be paid out *equally as it came in*"; that she was present when the agreement was made; that her aunt Francesca and Mr. Andreani were also present; that it "was one of the agreements *when the corporation was formed*"; that the understanding was that the money *was to be divided equally between them*, that is, it was to be divided among those interested in the corporation; that *it was so divided;* that *she* knew that *Andreani* was receiving funds from the corporation as they came in; that she kept no books as to how much money she gave to her *aunts* or how much *she* retained; that the agreement was made about dividing the profits at a regular stockholders' meeting *called for that purpose* in Mr. Andreani's office. (Emphasis added.) Thus it appears that each and all of the stockholders (and officers) knowingly participated in the irregular distribution of the assets and profits of the corporation, amounting in the aggregate at the first of the year 1930 to the sum of approximately $19,000. Of that amount petitioner was apparently chargeable with $10,000, as against which he claimed some offsets, including a distribution of *over $2,000 to one of the Misses Domec*. During the period of years that such assets and profits of the corporation continued to be apportioned as hereinbefore has been outlined, Miss More went to Mexico, where she remained for approximately a period of two years. While in Mexico, and at her insistent request therefor, petitioner caused several hundred dollars, in the aggregate, of the funds of the corporation to be forwarded to Miss More, which she used for her own private purposes. On her return to Los Angeles, in January, 1930, she became dissatisfied with the manner in which petitioner was or had been managing the business of the corporation and soon thereafter, either because of her suggestion in that regard or at his own initiative, petitioner ceased to concern

himself with the financial affairs of the corporation, and he accordingly notified the bank with which the funds of the corporation were deposited that, following such notice, funds would be withdrawable without his authorization but on the signature of Miss More alone. Thereafter that plan was followed. At about the same time, each of the Misses Domec also indicated a lack of confidence in petitioner, with the result that they consulted other counsel whom they engaged to represent them in matters relating to the corporation. A little later, a portion of the stock of the corporation which had been the property of Miss More was acquired by an estate, through execution of a judgment which had been rendered against her. Thereupon the attorney who was executor of such estate, together with the new attorney who represented the Misses Domec, joined in an investigation of the affairs of the corporation, with the immediate result that an action was brought against each of several different banking institutions to recover judgment for the amount represented by checks that had been cashed by such bank on an inadequate or improper endorsement thereof by petitioner alone, in violation of the corporate resolution which required that such endorsement be made by both petitioner and Miss More. In each of such actions a judgment was recovered and thereafter paid by the defendant bank. The evidence which was introduced in one of such actions was the direct cause of the institution of proceedings for the disciplining of petitioner, which resulted in the order for his disbarment. At or about that time an action was brought against petitioner and Miss More, in which they were jointly charged with having committed certain fraudulent acts in connection with the corporation. Petitioner stipulated that a judgment in the sum of $10,088.63 be entered against him in that action. It further appears that he agreed to that stipulation for the asserted reason that he believed ''other actions would not be pressed upon the same checks involved and charged to him and to other members of said corporation, or against the other stockholders, the various banks and against third and innocent parties''.

Again referring to the facts with regard to the question of restitution, it appears that, extending over a period of five or six years, in accordance with the prior agreement of the officers, directors and stockholders of the corporation and with their actual knowledge and at least implied consent

thereto, petitioner caused funds of the corporation to be irregularly distributed to himself, which amounted in the aggregate to approximately $10,000,—less an amount of $2,000 which assertedly was turned over to another of the officers. But it also appears that during such entire period, with the exception of taxes and the like, the corporation had no financial liabilities of any sort, and that all the other officers, directors and stockholders of the corporation committed similar acts involving the irregular appropriation of corporate funds. However, no one was directly injured. Petitioner owned 16 per cent of the stock of the corporation. As a result of his efforts and management, the corporation had sold all its property for the sum of $84,750. If the purchase price had been paid in cash, instead of in instalments, petitioner's total share therein would have amounted to $13,560. With the knowledge and consent of the stockholders in the corporation, he actually appropriated the sum of $8,000. However, the corporation was but the *"alter ego"* of its four stockholders; so that from a financial standpoint, at least, neither the corporation nor any of its stockholders had any just cause for complaint. In fact, in all probability "all would have been well" had not a new situation arisen. Times became hard; cabin sites on the property of the corporation no longer were readily salable; no money was being received; and it was but a natural result that distrust and dissatisfaction should take the place of the mutual trust, confidence and contentment which theretofore apparently had prevailed among the stockholders. But obviously the altered situation in that respect could not affect the former acts of petitioner concerning the distribution of corporate funds, which previously had been performed by him with the consent of the interested persons. And although petitioner originally was accused by The State Bar of having charged an "unreasonable" fee for his services as attorney for the corporation, he was not specifically found guilty thereof. His clients in the instant transaction consisted of three women, two of them being quite elderly and undoubtedly possessed of the various unfounded suspicions, whims and eccentricities that usually attend advanced age. They originally offered their property to petitioner for the sum of $16,000, but instead of accepting such offer petitioner succeeded in selling it for them at a price of $84,750, or at

a "paper profit" of $68,750. Petitioner organized a $50,000 corporation for them and performed all the necessary work in appearing before the various and sundry state commissions and agencies incidental thereto, including the corporation commission which granted a permit for the issuance and distribution of the stock of the corporation. Additionally, it appears not only that he drew all necessary legal papers and documents connected with the organization of the corporation and the creation of the trust pertaining to the sale of the lots, but that his services, in the course of five or six years of intensive efforts in the interests of the corporation, included consultations with his clients, attendance upon directors' and stockholders' meetings,—all for a purported fee of $8,000 to be paid to him in stock of the corporation. Merely in making the sale of the property, had petitioner received as payment therefor only the regular (lesser) commission of 5 per cent ordinarily charged by a real estate broker—instead of 10 per cent, frequently charged as commission for the sale of country property—his fee therefor would have amounted *in cash* to $4,237.50, which would have left a remainder amounting to only $3,762.50 to be paid for all the other legal services which he rendered to his clients. With reference to the question of restitution by him to the various persons who suffered financially because of his irregular diversion of funds of the corporation, petitioner asserts (without contradiction of the facts) that: "Long before these disciplinary proceedings were instituted, . . . without distinction as to the amounts chargeable to him as recipient of funds or dividends from said corporation", and "in order to prevent innocent third parties from suffering losses occasioned by the negotiation of the aforementioned checks", he *"sacrificed his last resources to reimburse all known negotiators thereof";* that he "suffered a judgment to be entered against him by stipulation, based on a complaint alleging embezzlement, in the sum of $10,088.63, and *greatly in excess of the amounts [properly] chargeable to him"*, notwithstanding the surrender by him to the corporation of "his [remaining] 40 shares of the capital stock of said corporation, at that time reasonably well worth over $4,000.00, upon the assumption and in the belief that other actions would not be pressed upon the same checks involved . . . " (Emphasis added.) When ques-

tioned with regard to the judgment last mentioned, petitioner testified that his "idea in confessing that judgment was to evade any trouble in litigation, particularly to protect Miss More from further trouble and litigation", but that he "didn't go into the fine points of what the allegations contained"; that he "also surrendered the stock . . . with the same idea in view", and "also repaid to innocent third parties, these intervening endorsers of these checks and others, in order not to make innocent persons suffer, all with a view to evading trouble and litigation". Incident thereto petitioner likewise asserts that although he was charged with having "improperly appropriated to his own use and benefit funds of said corporation and that the amount thereof was evidenced by the aforementioned judgment, . . . counsel and present secretary of said plaintiff corporation now admits that the said judgment should be reduced to from $2,000.00 to $3,000.00"; but that "in recapitulating the accounting between petitioner and said corporation and his previous repayment to parties involved in the various transactions . . . nearly all of the $3,963.37 recovered by said corporation from several defendants (. . . the present directors of plaintiff corporation would credit petitioner with the entire said amount, . . .) had been paid by petitioner in reimbursement to third parties, with the exception of an undetermined amount, some $800.00, advanced by Bank of America, but for which no claim has been advanced or pressed against petitioner"; that "out of the total amount charged and [on the] basis of the judgment entered against petitioner, a total of $2,850.00 had been by him paid at various times and in divers ways to other stockholders of said corporation during the four years in which [he] we received or took monies therefrom. . . . Moreover, at the time of said accounting and entry of judgment, . . . petitioner was reasonably entitled to approximately $3,000.00 in regular dividends from said corporation"; and that "All of the above would reflect a reduction of some $9,000.00 on the aforementioned obligation, with the said plaintiff corporation still holding the 40 shares of its capital stock returned by petitioner." Petitioner makes the further assertion that "The said reckoning would make possible a compromise and settlement along the lines suggested by the petitioner at the hearing before the Local Administrative Committee on March

[1939] last past. However, the present directors of P. D. Estate Co. find themselves unable to compromise, modify or amend the said judgment (now of record seven years and not renewed) for the reason that the aforementioned 70 shares of corporate stock formerly held by Marie More Monjardin are retained by . . . [the] Executor of the Estate of Lucie Dubordieu, Deceased, and that the holdings of Francesca Domec, Deceased, are not administered by any personal representative, an Administrator having resigned before returning an Inventory''; that ''the said directors decline to fix or accept a determined amount or assume responsibility for a settlement without adequate confirmation''; that ''notwithstanding that an equitable accounting resolves the controversy of any financial obligation to his reputed victim in his favor, in further effort to make amends and by way of additional restitution [petitioner] is willing to pay the sum of $2,000.00 when the directors of the P. D. Estate Co. are in a position to effect a settlement''. Furthermore, the findings of the examining committee contain the statement that ''the attorneys who brought suit against him [petitioner] and obtained judgment against him submit letters which appear in the exhibits, acknowledge that he was entitled to some offsets *which he did not urge''* (emphasis added); and also that, in addition to substantial credits which petitioner is entitled to have offset against the judgment, petitioner ''surrendered his stock in the P. D. Estate Company, the value of which no one is able to determine but which at whatever value it had at that time should be a further credit against said judgment''; also that ''in addition to the foregoing credits, there is evidence warranting a conclusion that a considerable portion of money in addition to the amounts above mentioned, which were obtained on checks endorsed by Mr. Andreani, went to other stockholders of the corporation and that he received no benefit from certain of these funds. That in so far as further restitution is concerned, the same is impossible at the present time due to petitioner having no funds which could be devoted to this purpose but that petitioner has indicated and we believe sincerely that if reinstated he will soon be in a position to effect a settlement of his obligation to the P. D. Estate Company and will be able to work out a satisfactory compromise and within a reasonable length of time will be able

to liquidate said obligations in full.'' It also appears in that connection, as petitioner asserts, that the ''petition for reinstatement has been . . . recommended by the persons or officials most directly and financially interested in the transactions growing out of which the disbarment of petitioner resulted, towit: Marie More Monjardin, former treasurer and intended principal shareholder of P. D. Estate Co., . . . Mr. W. G. Brooks, the contract purchaser of the realty holdings of said P. D. Estate Co. . . . ; Edmond Nelson, Esq., counsel and vice president of Bank of America . . . ; [also] H. G. Sadicoff, Esq., E. T. McGann, Esq., and Carl W. Minton, Esq., the present directors of said P. D. Estate Co. . . . ''

■ On the situation as above revealed, this court is not prepared to say that petitioner was not justified in claiming a right to some offsets as against the amount it is asserted he stills owes on the judgment.

However, as far as the instant situation is concerned, although petitioner's training as a law student and his experience in the practice of the law should have constrained him from committing the acts of which he was found guilty, nevertheless the law does not penalize its devotees for actions which are open to a satisfactory explanation,—nor for those which viewed from one standpoint, might bespeak a wrong intent, if, upon subjection to the light of a fair investigation and full disclosure of the facts and circumstances, a different or more favorable perspective may appear. Thus petitioner's claim to offsets against the amount of the judgment is entitled to consideration on the question of restitution.

Petitioner is a man fifty-four years of age. His lesson has been hard. For six years he has suffered the ignominy of professional and social ostracism. To an attorney such as Mr. Andreani, who, prior to expulsion from the ranks of the profession, had enjoyed wide social intercourse in many different civic and fraternal groups, such a period of exclusion would indeed be bitter punishment. ■ However, in accordance with the latter-day concept of such a situation, penalties imposed either in criminal matters or in disbarment proceedings are not intended ''as punishment'' of the offender. With respect to the disbarment of an attorney, expulsion from the ranks has for its aim the pro-

tection of the public and the reformation of the offender. Certainly the public has not suffered from the hands of petitioner since his disbarment. On the other hand, the record shows, without contradiction, that during that period of time petitioner has refrained from seeking employment or from entering into any association which in any way might be construed as an effort on his part to enter the field of the practice of the law. His petition shows that upon occasion, throughout the past six years, he has accepted very humble employment, at modest wages—at times as low as $12 per week; that for a considerable portion of that period he has given largely of his services, gratuitously, to divers civic and public projects which had for their aim the solution of problems relating to ''unemployment relief'' and other ''rehabilitation'' programs. The record shows that twenty-three members of the bench and numerous members of the bar, as well as many other citizens of splendid repute in the community, together with his employers during the past six years, have expressed, through letters, their confidence in petitioner's fitness for reinstatement as a member of the bar. The findings of the examining committee recite that petitioner appears to be ''a man of more than average mental ability''. It further appears from the record that during the past six years he has kept abreast of the law, and of the changes that have taken place therein; and that not long since petitioner passed with high rating a written and oral civil service examination for the office of referee in one of the departments of the state government.

■ In matters of disbarment,—if properly it may be said that the function of the courts of last resort is but coldly to declare the law without regard to possibly worthy merits of the accused, or human sympathies for his plight,—it might be argued that whenever it may appear that an attorney has grievously erred in the matter of his professional conduct, and by reason thereof it has been adjudged that he is no longer fit to be entrusted with the transaction of legal business for others, an order or judgment of his disbarment should be final. But that such conclusion is not the policy of the law is attested by the well-established rule that ''An order or judgment of disbarment is not necessarily final or conclusive for all time, and does not preclude the court for good cause from setting it aside and restoring the delin-

quent attorney." (*In re Treadwell,* 114 Cal. 24, 26 [45. Pac. 993], and precedents there cited.) In the case of *In re Nisbet,* 77 Cal. App. 260, 261 [246 Pac. 120], it also was said: "It is not the policy of the law, and is not considered to be in the interest of justice, that an attorney who has been disbarred for misconduct shall never under any circumstances be readmitted to practice." And in the case entitled *In re Stevens,* 197 Cal. 408, 424 [241 Pac. 88], this court declared that "The law is interested in the regeneration of erring attorneys, and in the enforcement of a sound discipline its disposition ought not to be to place unnecessary burdens upon them." The "door of hope" should no more be conclusively or finally shut as to them than it should be thus closed as against any other person who has erred and consequently may have suffered a somewhat similar penalty through the disciplinary functioning of the law. Reformation and regeneration are open to any man and, when effected, should merit a just reward. Although it has been declared that disbarment is not adjudged as a punishment, but is a method judicially devised to insure protection to the public,—it is clear that when reformation of a disbarred member has been effected the public is no longer in need of such protection. Reformation may only be brought about by the individual. It may be manifested solely by a "state of mind" which may not be disclosed by any certain or unmistakable outward sign. Its existence may be difficult to establish affirmatively, but its nonexistence may be "proved" by a single act. Although "rehabilitation" is the word commonly employed by lawyers and the courts to designate the desired "change of heart", or reformation, of a disbarred attorney,—in reality, rehabilitation is only that status which must immediately result, not from any words, acts or creditable conduct of such attorney, but rather from that which flows from an order or judgment of the court by which such attorney is restored to his former good standing and reinvested with the powers and dignities with which theretofore he had been authoritatively clothed.

In reaching a fair conclusion on the question of reformation in such a matter, the favorable testimony of acquaintances, neighbors, friends, associates and employers with reference to their observation of the daily conduct and mode of living of an attorney who has suffered disbarment

should weigh heavily in the scale of justice. ▆ Furthermore, in cases such as the one here concerned, which involve a charge of misappropriation of funds, it should be clear that although restitution may seem to indicate repentance, such act in itself "works no magic". Nor does the failure to restore, in whole or in part, definitely establish lack of contrition. The importance of making restitution, and a conclusion respecting the weight which should be attached thereto, should be determined largely by the financial or other ability of the attorney to restore that which he has misappropriated, as well as by his attitude of mind regarding the matter. A wealthy attorney who has suffered disbarment should not be commended too highly for the restoration of a sum of money, however great, where such act would involve no appreciable hardship on him. Nor should one in straitened circumstances be condemned for failure to make restitution, where the return of a comparatively insignificant amount might involve great sacrifice. In the matter of making financial amends, each should be judged not only by his ability to restore, his sacrifice of financial advantages or bodily comforts of himself or family, but also by his attitude toward the subject as evidenced by a spirit of willingness, earnestness and sincerity. ▆ From a consideration of the foregoing, therefore, in the instant matter, it would appear that greater weight might have been given to the recommendation of the local administrative committee—which not only had the opportunity to observe directly the petitioner and the numerous witnesses and to consider the testimony in the first instance, but also heard the matter anew after admonition to give careful attention to the question of rehabilitation. And if reformation may be "proved" by testimonies of meritorious conduct, the conclusion must be that petitioner has fully established his right to an order of reinstatement in the practice of the law.

▆ As hereinbefore has been indicated, at the time when the board of bar governors issued its recommendation of disbarment, or thereafter within the time prescribed therefor, petitioner voluntarily declined to avail himself of the right which was open to him of having the record reviewed by this court. In that connection, it is indicated by petitioner that his failure to do so, as well as his failure to present a more adequate defense to the charges made against him by either

the local committee or the board of bar governors, was due, in part at least, to petitioner's ill health at or about the times in question. However, had this court been requested in the first instance to review the full and complete history of the entire transactions out of which the charges assertedly arose and that thereafter were instituted against petitioner, it may be that the order of disbarment would not have followed. And it is extremely improbable that—if the facts of the transactions upon which the recommendation of disbarment was predicated in this case had been submitted in a criminal trial—a jury would have found petitioner guilty of the offense of embezzlement. Although it is the general rule that on an application for readmission the court will not weigh the evidence in its relation to the original order of disbarment, particularly where a review of the proceedings was had by this court,—nevertheless, in instances where this court has not theretofore had the opportunity of considering the entire record prior to the application for readmission, such as is the case herein, the aforementioned rule should be qualified to meet that situation. In other words, on an application for readmission, where the proceedings on disbarment have not theretofore been reviewed by this court, the latter should not be precluded in the proceedings for readmission from considering evidence in the light of the charges originally made. However, as hereinabove has been indicated, in the instant matter,· since it is the conclusion of this court that the evidence bearing on the question of the right of petitioner to readmission fully warrants the issuance of its order in that respect, it does not become necessary to weigh the evidence for any other purpose.

Accordingly, it is ordered that the petitioner be and he is hereby restored as an attorney and counselor of this court, and that his name be reinstated upon the roll of attorneys thereof, and that he be entitled henceforth to practice in all the courts of this state.

Rehearing denied.