[S. F. No. 22486. In Bank. Nov. 28, 1967.]

HERBERT RESNER, Petitioner, v. STATE BAR OF
CALIFORNIA, Respondent.

Gerald D. Marcus and John A. McGuinn, Jr., for Petitioner.

Lou Ashe, William K. Coblentz, Benjamin Dreyfus, James Martin MacInnis, William M. Malone and Herman F. Selvin as Amici Curiae on behalf of Petitioner.

L. LaMar Forshee for Respondent.

PETERS, J.—In March of 1960 petitioner was disbarred. (*Resner* v. *State Bar*, 53 Cal.2d 605 [2 Cal.Rptr. 461, 349 P.2d 67].) On September 11, 1965, he petitioned for reinstatement. After 11 hearings, the special administrative committee by a vote of two to one found that Resner had demonstrated his rehabilitation and that his present moral qualifications warranted reinstatement. All three members of the committee also found that he had failed to demonstrate the present ability and learning for the general practice of law requisite to reinstatement, and recommended that he be required to pass an examination designated by the Board of Governors of the State Bar. The board reached opposite conclusions on both issues. By a vote of 12 to 1, the board found that Resner is not ''sufficiently rehabilitated to warrant his reinstatement and that he does not have the high moral qualifications required of a member of the Bar.'' [1a] The board also found by a vote of 9 to 4 that he has sufficient present learning in the law to permit him to resume practice.[1]

Petitioner was born in 1909. He has been married twice and has three grown children. He practiced law from 1935 until his disbarment. He first specialized in labor law and subsequently handled claims by longshoremen and merchant seamen for personal injuries sustained in their course of employment.[2] He practiced in San Francisco and Los Angeles.

The charges resulting in disbarment related to his mishandling of sums received on behalf of three of his clients in settlement of their claims. In the transactions, petitioner received settlement checks and, with the clients' authorization to sign their names to the checks, deposited the funds in personal bank accounts. Petitioner did not maintain a trust account. Petitioner then sent checks to the three clients drawn upon his personal accounts, but the checks were returned to

---

[1]After the local committee had made its findings petitioner presented to the board further evidence on the issue of his present learning in the law. Upon the review of this and the other evidence on this issue we are satisfied that the board's finding is not only supported but should be and is adopted as the finding of this court. The State Bar does not contend to the contrary.

[2]Petitioner also engaged in appellate work. He appeared as counsel of record in the landmark cases of *In re Bell*, 19 Cal.2d 488 [122 P.2d 22] and *James* v. *Marinship Corp.*, 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]. He was also counsel of record in the United States Supreme Court in *De Zon* v. *American President Lines*, 318 U.S. 660 [87 L.Ed. 1065, 63 S.Ct. 814] and *Unemployment Comp. Com.* v. *Aragon*, 329 U.S. 143 [91 L.Ed. 136, 67 S.Ct. 245].)

the clients when they tried to cash them because there was insufficient funds in petitioner's account. Subsequently, petitioner paid each of the clients in full by cashier's check. At the time of hearing before the Board of Governors on the charges for which he was subsequently disbarred, which was about five months after the first of the local committee hearings, petitioner still had not established a trustee account. It was also shown that petitioner misrepresented to one of the clients that the claim was pending and that no funds had been made available when in fact he had previously deposited the settlement check.[3]

It was held that petitioner's conduct constituted a violation of his oath and duties as an attorney, the commission of acts involving moral turpitude, and a violation of rule 9, Rules of Professional Conduct. (*Resner* v. *State Bar, supra,* 53 Cal.2d 605, 612.)

Prior to his disbarment, disciplinary proceedings were pending against petitioner in respect to a misappropriation of funds of another client, Mrs. Verna Page. Petitioner settled a case for Mrs. Page, and she left the funds, over $29,000, with petitioner for investment. He purchased bonds with the funds, but subsequently converted part of them, approximately $16,000, to his own use. After disbarment, petitioner recognized the obligation and agreed to repay Mrs. Page in monthly installments including 7 percent interest. During the five years prior to the present hearings petitioner had paid Mrs. Page $10,820 in principal and interest. The attorneys representing Mrs. Page filed a letter signed by them and by Mrs. Page, stating that petitioner had made such payments to Mrs. Page as his income would allow, that he had never questioned the legal and moral propriety of his obligations to her, and that he has always expressed his sorrow at having caused Mrs. Page the financial problems. The attorneys also wrote that they believe he has shown remorse and a sense of responsibility and "that it will be to his benefit, the benefit of Mrs. Page and the benefit of the . . . Bar, if he were reinstated."

---

[3] In the disbarment proceedings with regard to this transaction, the local committee at first recommended disbarment, but after petitioner upon a further hearing introduced evidence of family and personal problems, the committee reduced its recommendation to a two-year suspension. As to the other two transactions, the local committee found that petitioner did not wilfully intend to steal or misappropriate money, and that rule 9 had been violated, and the committee recommended no more than a public reproval. The Board of Governors' recommendation of disbarment was based on the combined record of the three transactions.

At the hearings before the local committee petitioner testified and presented testimony by others that during the latter part of the 1950's he was a severely emotionally disturbed person as a result of his domestic relationships. His first wife developed mental and alcoholic problems in 1950 and committed suicide in 1955. His second wife had a penchant for gambling and was an ardent horse-racing fan, and petitioner became deeply involved in that activity. The second marriage which lasted about two years ended in divorce in 1959. At the time he was disbarred in 1960, he had substantial financial liabilities.

After his disbarment, from May 1960 until March 1963, petitioner was associated with the Casa Mobile Corporation which was engaged in real estate development. He was paid $16,470 over the three-year period. Petitioner claimed that, according to his understanding, he was to have a 25-percent interest in the outcome of the venture, which was successful. He sued the owner of the corporation who filed a countersuit. The matters were thereafter settled with petitioner accepting the money already paid to him and waiving his claim against the owner.

In April 1963 petitioner and Maxine Marill (described by petitioner as his girl friend) entered into a real estate venture, the Maxmar Investment Company. Mrs. Marill owned a women's apparel shop in Oakland. She contributed between $30,000 and $35,000 to the venture.

Maxmar obtained properties in the Santa Clara area for the purpose of building multiple dwellings for resale. A profit was realized on the first few buildings, but the remaining developments were not successful and resulted in claims of $73,833.40 and considerable litigation. Maxmar still has one parcel of real estate near Saratoga. Petitioner estimated the value of the property at $204,000. It secures obligations totaling $132,900. Mrs. Marill vouched for petitioner's moral integrity, said that she had never seen him misrepresent or deceive, and felt that he was not to blame for the Maxmar losses.

The local committee found that the lack of financial success of these developments was due to factors beyond petitioner's control and that "no evidence of improper, immoral, unethical or sharp practice was adduced." (There was evidence that during the period there were substantial layoffs in a number of industries in Santa Clara County.) Petitioner stated that

he received about $11,000 from Maxmar for his expenses, which he is obligated to repay.

Since his disbarment, petitioner has done legal research for various attorneys earning $17,573.88, and was paid $11,378.37 in fees owed to him prior to his disbarment. In May 1965 he began doing legal research on a full-time basis for attorney Dorsey Redland at a salary of $600 a month and, according to the petition, is still so employed.

The local committee found that petitioner's liabilities, actual and potential, total $98,789.36, which includes disputed tax liabilities of $44,824.09 and approximately $30,000 of obligations arising from the activities of Maxmar.

Numerous attorneys made favorable comments regarding petitioner's rehabilitation, trustworthiness, fiduciary responsibility, ability and character, and recommended that he be reinstated. Several of the attorneys had engaged in litigation with or against petitioner's clients prior to disbarment, and they stated that in all of their contacts he had acted ethically and was a lawyer upon whose word they would place great trust.[4]

A number of attorneys with whom he had dealings since his disbarment also urged his reinstatement. Miss Redland testified that in her opinion petitioner's moral character is good, that "he does not seem to have the emotional habits that led him to the problem to begin with," that he accepted and understood his problem and would make sure that it did not happen again, that if he is reinstated she would be "honored to . . . have him associate with me," and that she "wouldn't have any reservation to refer a case to him and let him handle his own payment of trust fund moneys. I think he knows more about trust accounts and the importance of them at this point than the rest of us. And they are very important. I don't mean to be light about it. But I think it's been a long bitter lesson for him to learn. And he has learned it."

Ben K. Lerer, an attorney who had known petitioner for many years, stated that after disbarment petitioner was full of remorse, that he did not blame anyone but himself, that this was a thing of the past, and that he was "going to work toward trying to not only rehabilitate himself, but perhaps to place him in some sense of respectability before the eyes of his

---

[4]Among these were Edwin L. Gerhardt, Edward D. Ransom, J. T. Cooper, John F. Porter, Robert C. Taylor, Henry R. Rolf, J. Stewart Harrison and Brent M. Abel. Several of these attorneys are senior partners in large law firms, and others have been presidents of bar associations.

friends. . . . And as far as I'm concerned, I would trust Mr. Resner with any case that I would have or any finances connected with it. I think that Mr. Resner, having done what he did, was an unfortunate situation; but there is no question in my mind that he's completely rehabilitated himself. . . ."

Richard Gerry, a former legal associate, testified that in the year immediately preceding the hearings he had seen petitioner frequently, that petitioner now appears to be emotionally stable, that petitioner had ably and properly handled some financial transactions for him involving disbursement of funds, that in his opinion petitioner is rehabilitated, and that he would without hesitation refer clients to petitioner to handle the clients' money.

Attorney Harold Dobbs testified that petitioner is "a man who recognizes the severity of his offense to the point where, of course, he'd like to probably cut off both hands if he could before he did it and that he would never do it again. I think he is a matured individual. . . . I think from what I know that he is a man who deserves another chance. . . . And I hope, I really hope that he does get that chance."

Two other attorneys, Bruce Walkup and George T. Davis, for whom petitioner had worked during his disbarment, stated that they thought so highly of him that they would be willing to associate with him.

Attorney Tevis Jacobs reported that he had spoken with several federal judges about petitioner and that the judges before whom petitioner conducted most of his practice all spoke highly of him.[5]

This court, of course, has the inherent power and authority to reinstate an applicant previously disbarred in spite of an unfavorable report upon such application by the Board of Governors of the State Bar. (*Allen* v. *State Bar*, 58 Cal.2d 912, 913, 915 [26 Cal.Rptr. 771, 376 P.2d 835]; *Preston* v. *State Bar*, 28 Cal.2d 643, 650 [171 P.2d 435].) The recommendation of the board is advisory, and the final determination rests with this court. The burden of establishing rehabilitation is upon the person seeking reinstatement. (*Werner* v. *State Bar*, 42 Cal.2d 187, 189 [265 P.2d 912].)

Testimony of friends, associates, and members of the bar is

---

[5]Six other attorneys, Lou Ashe, William Coblentz, Benjamin Dreyfus, James Martin MacInnis, William M. Malone, and Herman F. Selvin, filed an amicus curiae brief on behalf of petitioner in which they opined he was rehabilitated, trustworthy and competent, and should not be penalized because of his indebtedness.

entitled to careful consideration and should weigh heavily in the scales of justice. (*Werner* v. *State Bar, supra,* 42 Cal.2d 187, 196-197; *Preston* v. *State Bar, supra,* 28 Cal.2d 643, 650-651.) Petitioner has made a strong showing by testimony and letters of associates and attorneys that he is rehabilitated and of good moral character. He has certainly established a prima facie case of rehabilitation.

The board relies upon several matters as warranting its refusal to reinstate petitioner:

*Asserted Solicitation of the Case of Kurt Guthman*

Kurt Guthman, a seaman who sustained an injury resulting in the loss of a finger, testified that in 1964 while hopitalized he was introduced to petitioner who was visiting a friend in the hospital and that petitioner asked about the injury, said he was a lawyer and would represent him, and took notes of the conversation on a legal size pad. Petitioner denied offering to represent Guthman. He testified that he did not recognize Guthman or recall his name but that on one occasion while visiting a friend at the hospital the friend introduced him to a seaman who had a "finger accident," that the seaman told him about the accident, and that he told the seaman that he should see a lawyer.

Petitioner stated that he first went to the hospital to see his friend at the latter's request. He had represented the friend with regard to a prior injury and arranged a settlement of about $25,000. The friend who had been injured by an explosion while working aboard a ship asked petitioner about certain attorneys he was considering retaining in regard to his subsequent injury. After some discussion, the friend asked petitioner to obtain Bruce Walkup, and petitioner returned to the hospital with Walkup. Petitioner's friend signed an agreement with Walkup.

The local committee did "not accept the testimony of Kurt Guthman insofar as it would indicate unauthorized practice of law by petitioner during the period of his disbarment." The State Bar urges that there is little reason to disbelieve Guthman's testimony that petitioner solicited the case.

It is clear that there is a sharp conflict in the testimony and that the local committee which took the testimony found in favor of petitioner on the issue. The board did not make specific findings on this issue or any other but found only that petitioner is not sufficiently rehabilitated.

■ As already pointed out, factual findings made by the local committee and the board, even when in accord, are not binding on this court. (*Schullman* v. *State Bar*, 59 Cal.2d 590, 599 [30 Cal.Rptr. 834, 381 P.2d 658].) ■ When the findings and recommendations rest primarily on testimonial evidence and the local committee and the board are in conflict, the decision of the local administrative committee is entitled to considerable weight because it was in a position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. (*In re Gaffney*, 28 Cal.2d 761, 765 [171 P.2d 873]; *Werner* v. *State Bar*, 13 Cal.2d 666, 676 [91 P.2d 881]; *Mauer* v. *State Bar*, 219 Cal. 271, 276 [26 P.2d 14]; see *Zitny* v. *State Bar*, 64 Cal.2d 787, 790 [51 Cal.Rptr. 825, 415 P.2d 521].) ■ Here the local committee heard the witnesses, and the board did not. Further, it is difficult to believe that petitioner, after having secured an attorney for his friend who apparently had reason to have great confidence in petitioner, would then proceed to ignore his incapacity by holding himself out as an attorney to a stranger and seeking to secure the client for himself. Under all the circumstances, the finding of the local committee should be and is adopted as the finding of this court.

*Claimed Indirect, Evasive or Unworthy-of-Belief Answers by Petitioner*

■ The State Bar points out that while being questioned about his conversion of part of Mrs. Page's funds petitioner was unable to recall whether the securities he purchased on her behalf were placed in her name or in his own. He said that he had invested the money but thereafter had cashed in some of the securities and used the proceeds for his own purposes.

The State Bar also points out that petitioner upon questioning in regard to his dealing with one of the creditors of Maxmar said he could not recall ever promising to pay the creditor a certain sum by a certain date.

The State Bar also relies upon answers by petitioner to questions relating to a check for $18.50 returned by a bank marked NSF. The check had been submitted to a court for the filing of an answer on behalf of Maxmar, Mrs. Marill and himself to an amended complaint. Petitioner testified that at the time the corporation "was taking care of these things," that the corporation would not have issued a check without his signature, but that he had no independent recollection of having issued the check.

With regard to the conversion of Mrs. Page's funds, petitioner at all times admitted the conversion and has made substantial restitution. His failure to remember the exact details as to how the conversion was accomplished does not seem to warrant the conclusion that his answers were indirect or evasive. As to the question of the promise to pay the creditor, petitioner said that he had had informal conversations with the creditor but could not remember making any promise to pay a certain amount on a date certain. It seems apparent that the question was fully answered. Similarly, his answers with regard to the $18.50 check appear to be full and open and to the best of his recollection.

In this connection the State Bar characterizes as unworthy of belief petitioner's testimony that he had nothing to do with the preparation of financial statements of Mrs. Marill made in connection with her applications to lending institutions for loans. Petitioner said that the loans were procured through brokers. Apparently there were no inaccurate statements on the loan applications. The claim that petitioner must have prepared the applications is based on the assertion that only he had the necessary information. But petitioner in this regard testified that he regularly discussed the business with Mrs. Marill, including the prospective value of the property after the buildings were built. Certainly it is reasonably probable that, although some of the information may have been furnished by petitioner, the information was furnished in connection with the general operation of the business and not for the purpose of completing loan applications.

*Asserted Doubt as to Petitioner's Responsibility and Trustworthiness in Handling Funds of Others in the Light of His Use of Mrs. Marill's Funds in the Maxmar Venture.*

The State Bar concedes that there is no showing of actual fraud in the conduct of the Maxmar enterprise and that Mrs. Marill was ready and willing to join petitioner in the venture. The State Bar urges, however, that in the light of the close personal relationship between him and Mrs. Marill, he should have been "more conservative" in handling her funds. There is no impropriety in using the funds of another in a speculative venture, however close the relationship of the parties, where the person supplying the funds is competent, is fully advised as to the nature of the venture, and chooses to go ahead with it. So far as appears this is such a case. It should be noted in this connection that the local committee found that the lack of success of the venture was a result of a

housing depression in the area, and not causes under petitioner's control.

*Other Matters Claimed to Show Lack of Rehabilitation and Present Moral Fitness.*

 Petitioner testified that, at least in one case and possibly more where Maxmar, Mrs. Marill, and petitioner were sued, he filed verified general denials "purely for the purpose of obtaining time in order to work out a settlement of these claims."

In a similar situation this court pointed out: "The denials were admittedly improper and cannot be excused by a practice too generally indulged in. However, it is contended that the infractions were more in the field of pleading than in morals. A search of the authorities fails to reveal a case where a person making such a verification has been charged with a violation of law or, if he was an attorney, that he was charged with unprofessional conduct or subjected to disciplinary proceedings. If such a denial, verified in the usual form, is contrary to good morals and therefore an act of moral turpitude within the definition of that term (see *Lantz* v. *State Bar,* 212 Cal. 213, 218 [298 P. 497]; *Matter of Coffey,* 123 Cal. 522, 524 [56 P. 448]), it is feared that in the history of the legal profession in this state many a practitioner whose moral character was not otherwise questioned could have been subjected to disciplinary proceedings. In any event, such a course of action is properly criticized and condemned as not within the required standards of pleading and practice. As applied to the circumstances of this proceeding it may not justly be said that a lack of good moral character has been shown by the form of the pleading and its verification. In other words the record does not justify the conclusion that the petitioner in making the denials in the form indicated and in verifying his answers is, because thereof, lacking in good moral character." (*Werner* v. *State Bar, supra,* 42 Cal.2d 187, 196.) That language is here applicable.

The State Bar also points out that petitioner guaranteed notes when he was without personal funds, but there is no showing that any creditor was misled or that petitioner's guarantee was anything more than a mere formality insofar as the creditors were concerned.

 The State Bar places particular emphasis on the fact that petitioner now has substantial financial obligations and urges that this constitutes such a pressure upon petitioner

that he should not now be admitted. It is a fact that although he has made substantial payments to Mrs. Page since his disbarment he still owes her an appreciable sum of money. The record also shows that since his disbarment he has incurred other substantial liabilities. At present his total liabilities, actual and potential, are substantially greater than they were at the time of his disbarment. The State Bar argues that, since one of the main reasons for the misconduct that led to his disbarment was the pressures of his "overwhelming" financial obligations there can be no assurance that "pressures now unknown will not develop at some future date with equally disastrous results."

In reference to such a contention this court has said: "A wealthy attorney who has suffered disbarment should not be commended too highly for the restoration of a sum of money, however great, where such act would involve no appreciable hardship on him. Nor should one in straitened circumstances be condemned for failure to make restitution, where the return of a comparatively insignificant amount might involve great sacrifice. In the matter of making financial amends, each should be judged not only by his ability to restore, his sacrifice of financial advantages or bodily comforts of himself or family, but also by his attitude toward the subject as evidenced by a spirit of willingness, earnestness and sincerity." (*In re Gaffney, supra,* 28 Cal.2d 761, 764-765 .) This language is particularly applicable here.

The contention was also answered in the amicus curiae brief filed on petitioner's behalf. It was there stated:

"The Bar's argument is that petitioner has heavier financial obligations now than he had when disbarred and that, if reinstated, he would be subject to pressures which would militate against his being an ethical and honest practitioner. However, this argument was rejected by the special Committee which recognized that if this were a proper criterion, one in petitioner's situation could never hope for reinstatement. The special Committee recognized that it was not the existence of problems for petitioner that was vital, for each of us always has problems; rather, it considered the essential question to be petitioner's inner strength to cope with problems, and this it found he had.

"The special Committee recognized and we urge this Court to recognize that the test for rehabilitation is not the state of petitioner's wealth or the amount of money that he owes now or owed previously. Nor is it whether he was an astute or fortu-

nate businessman in the years since disbarment, or something less than astute or perhaps less than fortunate. For even had petitioner enjoyed enormous financial success and now stood before this Court debt-free and possessed of great wealth, the essential question of rehabilitation would still remain.''

Measured by these standards petitioner should not be penalized for sustaining business reverses not caused by any improper action on his part.

■ There can, of course, be no absolute guarantee that petitioner will never engage in misconduct again. But if such a guarantee were required for reinstatement none could qualify. All that we can require is a showing of rehabilitation and of present moral fitness. ■ A reading of the entire record indicates that Resner has convincingly established his rehabilitation and moral fitness by his own statements and those of many attorneys on his behalf. Rehabilitation is of course a ''state of mind.'' ■ The law looks with favor upon the regeneration of erring attorneys and should not place unnecessary burdens upon them. (*In re Gaffney, supra,* 28 Cal.2d 761, 764; *In re Andreani,* 14 Cal.2d 736, 749 [97 P.2d 456].) Tested by these standards petitioner has met the burden placed upon him. He should be reinstated.

The petition for reinstatement is granted. It is ordered that Herbert Resner be reinstated upon the roll of attorneys at law in this state upon payment of the fees and taking the oath required by law.

Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Peek, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.