George C. PRICE, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 15PDJ038.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Dec. 9, 2015.

**OPINION AND DECISION DENYING
REINSTATEMENT PURSUANT
TO C.R.C.P. 251.29(e)**

## I. *PROCEDURAL HISTORY*

Petitioner took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 17, 1980, under attorney registration number 10652. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in

this reinstatement proceeding.[1] On March 26, 2010, the Presiding Disciplinary Judge, William R. Lucero ("the PDJ"), approved a conditional admission of misconduct and suspended Petitioner's license for a period of one year and one day. The suspension took effect May 31, 2010. Petitioner did not seek reinstatement from this suspension. On January 17, 2013, the PDJ approved a second conditional admission of misconduct and suspended Petitioner's license for an additional two years and four months, effective that same day.

On May 29, 2015, Petitioner filed a petition for reinstatement. Katrin Miller Rothgery, Office of Attorney Regulation Counsel ("the People"), answered on June 8, 2015. The PDJ held a scheduling conference on June 22, 2015, and set this matter for a hearing under C.R.C.P. 251.29(d) and 251.18. On October 6, 2015, a Hearing Board comprising Thomas J. Overton and Gary L. Polidori, members of the bar, and the PDJ held the reinstatement hearing. Petitioner appeared pro se, and Rothgery appeared on behalf of the People. The Hearing Board considered testimony from Frank Roman, Andrew McCollum, and Petitioner. The PDJ admitted stipulated exhibits S1–S10 and Petitioner's exhibits 1–3 and 5.

## II. FINDINGS OF FACT

The findings of fact here—aside from the sections describing Petitioner's disciplinary record and conditional admissions of misconduct—are drawn from testimony offered at the reinstatement hearing, where not otherwise noted.

### Petitioner's Past Disciplinary Record

Petitioner received a letter of admonition in 1991, a second letter in 1993, and a third in 1994.[2] These matters involved his neglect of clients, failure to provide written fee agreements, lack of communication, and misrepresentation. Petitioner was later suspended for one year and one day on December 16, 1996, for seriously neglecting multiple client matters, as well as for mishandling client funds and writing bad checks.[3]

Petitioner petitioned for reinstatement from this suspension in 2000.[4] Before that reinstatement hearing was held, however, the People filed two disciplinary complaints against Petitioner. These complaints were premised upon Petitioner's disregard of the rules requiring him to wind up his practice, including neglecting to file the required affidavits, to notify his clients and opposing counsel of his suspension, and to advise his clients to seek substitute counsel. The People also alleged that he continued to represent clients while suspended.[5] A hearing board found that Petitioner had committed these additional disciplinary violations and recommended suspending him for yet an additional period of time.[6] The hearing board also determined Petitioner was unable to prove his compliance with all applicable disciplinary orders, rehabilitation, and fitness to practice. Thus, it recommended denial of his petition for reinstatement.[7] The Colorado Supreme Court accepted this recommendation on January 16, 2001.[8] But it declined to suspend Petitioner for an additional year and one day, as the hearing board had also recommended, reasoning that an additional suspension would not meaningfully protect the public in light of the two-year bar against filing for reinstatement.[9]

On January 14, 2002, Petitioner filed a second petition for reinstatement and was ultimately reinstated to the practice of law on November 22, 2002.

---

1. *See* C.R.C.P. 251.1(b).

2. Ex. S4 at 0004.

3. Ex. S4 at 0004; *People v. Price,* 929 P.2d 1316, 1317–20 (Colo.1996).

4. *In re Price,* 18 P.3d 185, 192 (Colo.2001) ("*Price II* ").

5. *Id.* at 188, 192. Petitioner's petition for reinstatement and the two disciplinary complaints were consolidated.

6. *Id.* at 188–89.

7. *Id.* at 188.

8. *Id.* at 192.

9. *Id.*

### Petitioner's 2010 Conditional Admission of Misconduct

As set forth in the 2010 conditional admission of misconduct (case number 09PDJ025, consolidated with 09PDJ091 and 10PDJ020), Petitioner engaged in misconduct in seven client matters.

In the first matter, Petitioner agreed to represent Duane Dillon in a discrimination matter against his former employer. Once the case was at issue, Petitioner took no action and completed no discovery. Petitioner also never responded to three letters sent by opposing counsel and failed to file a response to a motion to dismiss. Petitioner agreed that this conduct violated Colo. RPC 1.3, which requires lawyers to act with reasonable diligence and promptness.

In a second client representation, Herman Ortiz hired Petitioner to file a discrimination complaint against his employers. Ortiz passed away in November 2005, effectively terminating the representation. Petitioner then created an estate for Ortiz but did not enter into a fee agreement with Ortiz's personal representative. In May 2008, Petitioner filed the discrimination complaint in federal district court and paid the filing fee by check, but his check was returned by the court as unpaid. Thereafter, Petitioner filed a motion for default. On November 4, 2008, the court issued an order stating that Petitioner's affidavits of service were incomplete. Petitioner waited more than three months to correct this filing. Petitioner admitted that his conduct in this matter violated Colo. RPC 1.3 and Colo. RPC 1.5(c), which prohibits lawyers from entering into contingent fee agreements that do not conform to the requirements of Chapter 23.3 of the Colorado Rules of Civil Procedure.

The third matter involved Petitioner's representation of Stephen Rees. Petitioner represented Rees in two discrimination cases against his employer. Petitioner never clarified the basis of his fee in writing. Petitioner acknowledged that this conduct violated Colo. RPC 1.5(c).

In the fourth matter, Betty Johnson retained Petitioner in a discrimination case against her employer. Johnson paid Petitioner $2,000.00 for the representation. Johnson never received a written fee agreement from Petitioner, who admitted he again violated Colo. RPC 1.5(c).

In a fifth client representation, Petitioner agreed to arbitrate a claim against a car dealer for undisclosed vehicle deficiencies on behalf of his client Julio Morales. On July 2, 2007, Morales paid Petitioner $1,250.00. The parties did not enter into a written fee agreement. Petitioner sent an arbitration request to the National Arbitration Forum ("NAF"), but his request was denied on July 30, 2007, because it was not accompanied by a filing fee. NAF thereafter denied Morales's claim and closed the file. Morales gave Petitioner two money orders in February 2009 for the filing fee. Petitioner sent the money orders to NAF but did not include Morales's request for arbitration, and as a result, the money orders were lost. Petitioner stipulated that his conduct in this case violated Colo. RPC 1.3 and Colo. RPC 1.4, requiring lawyers to reasonably communicate with their clients.

In a sixth matter, Petitioner agreed to represent Judy Bachmeyer in a case against the Archdiocese of Denver, with Richard Brentlinger acting as his co-counsel. Bachmeyer's case settled in January 2008 for $40,000.00. Petitioner placed the settlement funds in his trust account and paid Bachmeyer her portion. Petitioner retained $16,402.26 from the settlement, even though he was only entitled to $8,000.00 for his attorney's fees. Rather than immediately tendering $8,402.26 to Brentlinger's firm, Petitioner moved this sum into his operating account and then into his personal account. Petitioner consumed these funds for his personal use. Thereafter, he used personal funds to repay Brentlinger's firm. In this matter, Petitioner agreed that he violated Colo. RPC 1.15(c) (2008), which mandates that lawyers shall keep separate any property in which two or more persons claim interests until there is an accounting and severance of those interests. He also agreed he violated Colo. RPC 1.15(b) (2008), requiring lawyers to promptly deliver to clients or third persons any funds that they are entitled to receive.

In the seventh matter, Ralph Bernal hired Petitioner on a contingency fee basis to file a civil suit against three defendants. The case was eventually removed to federal court. The defendants filed a motion to dismiss the federal cause of action, and Petitioner's untimely response was stricken by the court. The case was returned to Denver District Court in April 2006. Petitioner took no action on the case until October of that year. Thereafter, Petitioner failed to serve discovery requests or to take any depositions. The court eventually entered summary judgment in the defendants' favor. Petitioner appealed this ruling to the Colorado Court of Appeals. The court of appeals determined that Petitioner's appeal was frivolous and awarded attorney's fees against him. His conduct violated Colo. RPC 1.3 and Colo. RPC 3.1, prohibiting lawyers from asserting frivolous claims.

As a sanction for his misconduct, Petitioner agreed to a one-year-and-one-day suspension. He also pledged to pay costs in the amount of $1,605.65 within thirty days of approval of the conditional admission and to refund $1,250.00 to Morales within that same time period. The PDJ approved the conditional admission on March 26, 2010, and Petitioner's suspension took effect on May 31, 2010. Petitioner paid the costs and restitution.[10]

### Petitioner's 2013 Conditional Admission of Misconduct

As set forth in the 2013 conditional admission of misconduct (case number 12PDJ002, consolidated with 12PDJ007 and 12PDJ070), Petitioner failed to properly wind up his practice in five client matters after the 2010 order of suspension entered. In four of those matters, Petitioner failed to notify his clients—Keyonna Moore, Constance Marker, Michael Fisher, and Mykola Abramyuk—of his 2010 suspension and instead continued to represent them. In his postsuspension affidavit he filed with the People and the PDJ, Petitioner falsely stated that he had notified each of these clients in writing of his suspension.

He also led each of these clients to believe he was lawfully representing them, even though he was suspended, and in all of these matters he continued to practice law. For example, in the Moore matter Petitioner appeared, while suspended, for a hearing held by the Denver Career Services Board. Petitioner agreed that this conduct violated Colo. RPC 1.4(a) and (b), which require lawyers to explain matters to clients so they can make informed decisions regarding the representation, and Colo. RPC 3.3(a)(1), which bars lawyers from knowingly making false statements of material fact or law to tribunals. He also agreed that he contravened Colo. RPC 3.4(c), prohibiting lawyers from knowingly disobeying obligations under the rules of a tribunal, and Colo. RPC 5.5(a), precluding lawyers from practicing law without a law license or other specific authorization. Finally, he admitted he violated Colo. RPC 8.4(c), which disallows conduct involving dishonesty, fraud, deceit, or misrepresentation.

Additionally, in the Moore and Fisher matters Petitioner disclosed his clients' identities and case information to another law firm without first obtaining his clients' consent to the disclosure of their confidential information. In these matters, Petitioner admitted to violating Colo. RPC 1.6(a), prohibiting lawyers from revealing information relating to the representation of a client unless the client gives informed consent.

Further, in the Abramyuk matter, Petitioner failed to provide his client with an accounting before distributing his settlement funds, and he paid these funds to a third party without his client's consent. Petitioner also failed to disclose his receipt of the settlement funds to his employer and instead kept all the attorney's fees for himself without permission. It was stipulated that Petitioner's actions amounted to intentional conversion in violation of Colo. RPC 8.4(c).

In a fifth matter, Petitioner began representing Carlo Lombardi in August 2007. After Petitioner was suspended in 2010, he worked as a paralegal at a law firm, where he drafted legal pleadings for Lombardi. He did not provide Lombardi with written notice of his suspension as required under the rules.

10. Ex. S3.

In this case, Petitioner acknowledged that he violated Colo. RPC 1.4(a) and (b), Colo. RPC 3.3(a)(1), and Colo. RPC 3.4(c).

Petitioner agreed to a suspension for two years and four months as a sanction for his misconduct. He also promised to pay costs in the amount of $843.55 within thirty-five days of the conditional admission's approval. The PDJ approved the conditional admission on January 17, 2013, and Petitioner's suspension took effect that same day. Petitioner did not pay any of the ordered costs. On August 15, 2013, the People offered Petitioner the opportunity to pay these costs under a monthly payment plan, but Petitioner did not accept the offer, nor did he respond to their email.[11] He never asked the PDJ for an extension of time to pay the costs. Rather, he handed the People a check for $200.00 the morning of the reinstatement hearing. This is the only payment he has made toward satisfying this order.

### Petitioner's Testimony Regarding His Qualifications for Reinstatement

Petitioner testified that he graduated from Colorado College in 1974 with a degree in political science. He then studied abroad in East Africa. Upon returning to the United States, he attended the University of Denver Sturm College of Law. After his first suspension in 1996, he worked as a disaster relief consultant for the Federal Emergency Management Agency. In that role, he assisted victims of the Hayman and Estes Park fires.

When he was reinstated in 2002, he opened a law practice focusing on education and employment law, ultimately representing more than 1,000 employees in disputes with their employers. He ran his own firm until he was suspended in 2010. According to Petitioner, he has engaged in significant public service work during his career, including guest lecturing at law schools and colleges and representing clients pro bono. He also did some nonprofit work and volunteered for Habitat for Humanity. Most, if not all, of this community service was performed before his 2010 suspension.

After his 2010 suspension, Petitioner worked as a paralegal at Webb & Schtul. He worked primarily under Marc Schtul's supervision, drafting pleadings and conducting legal research. After leaving that firm, Petitioner worked as a paralegal for the Furtado Law Firm until 2013. His responsibilities there involved putting together cases and doing legal research. In his 2013 stipulation, Petitioner agreed that he committed misconduct while working at Webb & Schtul and the Furtado firm, including most egregiously by failing to inform his former clients that he was suspended and by disbursing to himself attorney's fees from those settlement funds without his client's consent.[12]

After he was suspended in 2013, Petitioner began working for Denver Public Schools ("DPS") as a paraprofessional in a classroom for children with emotional disabilities at Gust Elementary School. He was employed there through 2015. His duties included dealing with behavioral issues and discipline, providing character education, and teaching academic subjects. Petitioner received significant training for his job, such as instruction on the legal requirements governing educational plans for special-needs students, several days of restorative justice training, and instruction on restraint and de-escalation techniques. At present, Petitioner is a restorative justice coordinator at a different DPS school. According to Petitioner, this position was a promotion.

Petitioner testified that he believes his paraprofessional position within DPS prepared him to reenter the legal profession for many reasons. First, he stated that working with children who have significant emotional problems was a difficult job, which had a significant impact upon him. Next, he was required to model good behavior while at Gust, including adhering to the character traits that the school was teaching its students. These traits, he stated, have a tendency to "rub off on the people who are teaching them." Even though his position with DPS was paid, Petitioner strongly believes that he has provided a community service by teaching children with emotional

11. Ex. S7.

12. *See* Ex. S4.

disabilities. He contended that his job duties and training have assisted him in maintaining legal competence, since he was required to understand the legal requirements involved in special education, as well as students' and teachers' legal rights. To that end, he has frequently reviewed DPS policies and regulations and has been required to expeditiously analyze critical disciplinary situations.

Petitioner also discussed his efforts outside of his job to maintain professional competence during his suspension. He testified that he could not afford to attend many Continuing Legal Education ("CLE") courses. Instead, between 2010 and 2012, he listened to a number of CLE home study courses.[13] Most, if not all, of these had expired, however. For example, he listened to 2004 and 2005 employment law conferences, a 2008 family law update, a 2002 employment law program, and a 2003 ethics CLE.[14] He was unable to state whether these expired CLEs discussed laws that were still current. Between 2012 and 2013, he attended eight estate-planning CLE courses.[15] Finally, he testified that he read a number of self-help books and listened to motivational CDs.[16]

When asked about his prior misconduct, Petitioner offered varied explanations. First, he theorized that he likely committed much of the misconduct leading to his 2010 suspension because he had a fee dispute with another attorney, he "probably took on too much work ... had too many cases," and when his mother passed away in 2007, he was unable to manage his responsibilities. He currently feels more prepared to handle work stressors because he has spent a great deal of time speaking with his wife—a psychologist—about his past transgressions. According to Petitioner, he now realizes that he has a tendency to "keep things inside," which can cause problems. He vowed to speak with his wife, who he characterized as the "best sounding board," rather than internalizing his feelings. Additionally, he has sought out mentors—former students who are now lawyers—whom he can call if he

finds himself in need of counsel. Petitioner is also confident that he appreciates how to handle funds—though he pledged to have someone else handle them should he return to solo practice. He did admit, however, that he has not had the opportunity to handle third-party funds since his suspension. He also defended the frivolous appeal he filed for Bernal by contending that he raised a novel legal issue, though his position was ultimately rejected, and by explaining that he became too personally involved in the case.

Next, Petitioner addressed the 2013 stipulation in which he confessed to intentionally practicing law while suspended. He admitted that his postsuspension actions likely led his clients to believe that he was still permitted to practice law, and he agreed that when he settled Abramyuk's case during his suspension he engaged in the unauthorized practice of law. Yet he argued that his actions in the Moore case—attending a hearing in front of the Career Services Board—did not amount to the unauthorized practice of law, despite his stipulation to the contrary. He also stated that although he had admitted to practicing law without a license while working at Webb & Schtul, he believed that paralegals were permitted to complete the tasks that he undertook and thus he did not act intentionally. Finally, when asked whether he would conceal something from his employer in the future as he did in the Abramyuk case, Petitioner promised that if confronted with similar circumstances he would be transparent. He offered no explanation as to why he took money from his employer without authorization.

Petitioner testified that he could not pay the costs assessed in his 2013 suspension because his financial situation was "horrendous." After his suspension, he made just $12.37 an hour working as a paraprofessional for DPS. His finances have since "loosened up," because he now is paid $18.00 an hour and his wife receives monthly Social Security benefits. When asked by the Hearing Board why he did not accept the payment plan

---

**13.** Ex. 3.

**14.** *See* Ex. 3 at 1–11, 15.

**15.** Ex. 2.

**16.** Ex. 3 at 22–29.

proposed by the People, or even pay a nominal monthly amount, he responded that he was "in a hole." [17]

In sum, Petitioner testified he understands that he has made some "pretty significant mistakes" in his law practice and that he needs to make amends. Today, he said, he strives to live by the character traits he taught his students at school, he has learned to communicate better, and he is more organized. If reinstated, he would not seek to return to the practice of law for at least one to three years. Ideally, he would like to remain at DPS, working in an upper-level administrative position or in the legal department. Petitioner vowed never again to practice law alone or without sufficient support. He did not object to the prospect of the Hearing Board placing conditions on his reinstatement, including requiring him to engage a practice monitor or to satisfy the costs he was ordered to pay in 2013.

### Testimony of Petitioner's Witnesses

While working as a paraprofessional at Gust Elementary, Petitioner worked under the supervision of lead teacher Frank Roman.[18] Roman and Petitioner were in charge of eight racially and socioeconomically diverse students, all of whom suffered from extreme emotional disabilities. Roman explained that these students would act out by throwing books, desks, and chairs, and frequently engaged in verbal abuse and fighting. Because of the volatile atmosphere, it was very difficult to staff the classroom and the school particularly valued male teachers.

Roman said Petitioner's responsibilities included escorting students to and from the school bus, providing daily academic instruction, and restraining students during unsafe situations. Roman was able to observe Petitioner's work habits and reasoning skills and felt that Petitioner brought an "air of professionalism to the classroom that [he] ha[d] not seen for quite a while." Roman explained that pictures reflecting fifteen character traits—such as honesty, integrity, and kind-

ness—were displayed on the classroom walls to encourage kids to exhibit these traits. He said that he often witnessed Petitioner modeling those traits. Roman also observed Petitioner advocating for his students. As an example, Petitioner requested and received twelve computers and a large-screen television for the classroom. Roman also frequently saw Petitioner intervening on behalf of his students with other teachers so that his students could participate in classes like art and gym. Roman felt that Petitioner had a good relationship with the students. Because Petitioner had fostered this relationship, he was able to keep the classroom environment safe by helping students to avoid dangerous situations and by providing workable solutions for students and staff. While at Gust, Petitioner also assisted other paraprofessionals in their dealings with the teachers' union. Roman testified that Petitioner was diligent, reliable, and timely. He gave Petitioner an overall "outstanding" rating on his annual performance review.[19] He did not know, however, why Petitioner's license to practice law had been suspended.

Andrew McCollum, Petitioner's nephew, also testified as to Petitioner's character and fitness to practice. In 2009, McCollum was charged with sexual assault on a child while working as a teacher. Petitioner represented McCollum pro bono in his criminal matter before giving him $35,000.00 of his personal funds to hire a criminal defense attorney. McCollum was happy with Petitioner's legal services. McCollum also testified that Petitioner allowed him to live in his home and gave him moral and financial support. He was grateful that Petitioner offered to sponsor him in a "Family and Friends" sex-offender treatment program. As McCollum described, this program lasted ten weeks, and it required Petitioner to supervise McCollum's probation and report any suspected probation violations. After leaving his teaching position, McCollum worked with Petitioner as a legal intern and then as a paralegal at Webb & Schtul and the Furtado

---

**17.** *See* Ex. S7.

**18.** Roman knew Petitioner for approximately ten years before Petitioner began working as Ro-

man's paraprofessional during the 2013–2014 school year.

**19.** Ex. 5.

firm. McCollum had no concerns with Petitioner's work ethic in these settings. Petitioner told McCollum that he had been suspended from the practice of law due to his "lack of communication with clients" and "bookkeeping issues."

### III. LEGAL ANALYSIS

[1] To be reinstated to the Colorado bar, an attorney who has been suspended for longer than one year must prove by clear and convincing evidence that the attorney has been rehabilitated, has complied with applicable disciplinary orders and rules, and is fit to practice law.[20] Failure to prove even one requirement is fatal to a petitioner's reinstatement.[21] When considering Petitioner's case, the Hearing Board must review his past disciplinary record.[22]

### Compliance with Disciplinary Orders and Rules

■ An attorney who is petitioning for reinstatement must show compliance with disciplinary orders and the Rules of Professional Conduct. The Colorado Supreme Court has determined that "[t]echnical violations of the disciplinary orders and rules will not always preclude reinstatement."[23] To decide whether a technical violation should bar reinstatement, the Hearing Board must examine the nature of the violation, including whether the violation affected clients or opposing parties and whether it caused harm or potential harm.[24]

■ The People assert that Petitioner has violated disciplinary orders by failing to pay the $843.55 incurred as costs in connection with his 2013 suspension. His failure to pay the costs is not merely a technical violation, say the People, because he has paid not even a portion of the costs. They argue that

Petitioner's failure to pay these costs is fatal to his reinstatement petition. For his part, Petitioner maintains that he was unable to pay the required costs because of a financial hardship. Yet in his hearing brief, filed on September 22, 2015, he states that he is "making payments at the current time to reimburse [the People] for those costs."[25]

It is undisputed that Petitioner paid the costs and restitution stemming from his 2010 suspension but has not paid the costs ordered in 2013. Over two years ago, the People offered Petitioner the opportunity to negotiate a payment plan. Yet he ignored the People's email. He took no additional steps to seek modification of the PDJ's order or to make nominal payments. Moreover, Petitioner represented in his hearing brief that he was currently making payments to the People, when this was not the case. Indeed, Petitioner made no payments until the morning of the hearing, when he tendered to the People a check for $200.00—just one quarter of what he actually owes. Petitioner's failure to pay costs has not affected any client. Nevertheless, we do not consider this failure a technical violation: Petitioner made no effort to pay the costs for almost two years. Perhaps even more egregious, he made a misrepresentation about the costs in his hearing brief.

Petitioner's failure to pay these costs renders him ineligible for reinstatement.[26] But we also address the deficiencies in his evidence supporting his rehabilitation and fitness to practice, which also compel us to deny his petition for reinstatement.[27]

### Rehabilitation

■ Although an order reinstating an attorney to the bar may include conditions, it is a prerequisite to any such order that the

---

20. C.R.C.P. 251.29(b).

21. *Price II*, 18 P.3d at 189.

22. C.R.C.P. 251.29(e).

23. *Price II*, 18 P.3d at 191.

24. *Id.*

25. Pet'r's Hr'g Br. at 3.

26. *Price II*, 18 P.3d at 189 ("Because the lawyer seeking reinstatement must prove that all three factors exist, a failure of proof on any one factor is fatal to the lawyer's reinstatement.").

27. *Id.* at 190 (finding that where a petitioner had not proved his compliance with disciplinary orders, it was not strictly necessary for the hearing board to discuss his fitness to practice and rehabilitation).

attorney has already been rehabilitated.[28] Reinstatement is not automatically granted even when a petitioner shows he or she has engaged in proper conduct while suspended.[29] Nevertheless, the law favors the regeneration of erring attorneys and should not place unnecessary burdens upon them.[30]

■ Our examination of Petitioner's rehabilitation begins with a review of the eight factors bearing on his state of mind and character as set forth in *People v. Klein*.[31] These factors are: character; conduct since the imposition of the original discipline; professional competence; candor and sincerity; recommendations of other witnesses; present business pursuits; personal and community service aspects of the attorney's life; and recognition of the seriousness of the previous misconduct.[32] The *Klein* criteria provide benchmarks to assess the likelihood that an attorney will repeat his or her prior misconduct.

We turn first to Petitioner's character and conduct since the imposition of his 2010 and 2013 discipline. Petitioner testified that his character is exemplary—he both teaches character traits to students and lives by those traits. He further stated that the motivational tapes he listened to during his suspension have influenced him to operate with integrity and honesty. He also pointed to the fact that he has not exhibited any behavior since his suspension that would indicate he is a person of bad character.

We find both of Petitioner's character witnesses credible and consider their testimony. Roman has worked with Petitioner in recent years, and he was in a position to observe Petitioner's character first-hand. Roman clearly found Petitioner's contributions to the classroom valuable. He adjudged Petitioner to be hard-working and blessed with analytic abilities. Roman, however, did not know why Petitioner's license to practice law had been suspended and thus could not meaningfully reflect on whether Petitioner had experienced regeneration in his character since his earlier misconduct. McCollum thought very highly of Petitioner, his uncle, and was visibly grateful for his moral and financial help, as well as for his willingness to support McCollum during his sex-offender treatment program. While Petitioner's interactions with both of these witnesses exhibit noble character traits, neither of these witnesses spoke to Petitioner's honesty or ability to handle money—significant factors in his prior discipline.

Next, we find that Petitioner takes very little accountability for the misconduct leading to his two suspensions, which diminishes in our eyes his candor and sincerity. We are concerned that after nearly five years, Petitioner blames his behavior on a fee dispute with opposing counsel and deemphasizes the misconduct to which he stipulated. While serving the 2010 suspension he then failed to comply with the rules governing suspended lawyers, including filing a false affidavit with the People and the PDJ misrepresenting that he had notified clients of his suspension. Rather than acknowledge that his dishonesty was serious, he argued that he merely failed to notify his clients via certified mail, and he

---

**28.** *See* C.R.C.P. 251.29(b). Rehabilitation has been defined as the regeneration of an erring attorney, denoting an overwhelming change in the petitioner's state of mind. *See In re Cantrell*, 785 P.2d 312, 313 (Okla.1989).

**29.** *In re Sharpe*, 499 P.2d 406, 409 (Okla.1972).

**30.** *Resner v. State Bar of Cal.*, 67 Cal.2d 799, 63 Cal.Rptr. 740, 433 P.2d 748, 755–56 (1967).

**31.** 756 P.2d 1013, 1015–16 (Colo.1988) (setting forth several factors for a hearing board to consider in determining whether an attorney has been rehabilitated).

**32.** *Id.* at 1016. We note that the *Klein* decision relies upon an earlier version of the *Lawyers' Manual on Professional Conduct* (ABA/BNA)

101:3005, which listed the above factors for assessing the rehabilitation of lawyers seeking reinstatement. The current version of the manual, however, sets forth a number of different factors to consider when evaluating a lawyer's rehabilitation and fitness, including: the seriousness of the original offense, conduct since being disbarred or suspended, acceptance of responsibility, remorse, how much time has elapsed, restitution for any financial injury, maintenance of requisite legal abilities, and the circumstances of the original misconduct, including the same mitigating factors that were considered the first time around. *Id.* at 101:3013. While some of these newly articulated factors are encompassed in our analysis, we do not explicitly rely on them to establish a framework for our analysis.

reasoned that his representation of Moore before the Career Services Board was proper. Additionally, Petitioner presented no evidence showing us that he understands the gravity of his mishandling and conversion of client funds.

Also important to our analysis is Petitioner's prior disciplinary history.[33] Petitioner was privately admonished in 1991, 1993, and 1994 for failing to provide his clients with written fee agreements, neglecting cases, and failing to communicate with his clients. He also made a misrepresentation to his client about the status of a matter. Then, in 1996, he was suspended for not having a written fee agreement, mishandling client funds in multiple client matters, failing to communicate, practicing law while suspended, and engaging in a pattern of neglect. Petitioner was denied reinstatement because he did not establish that he was fit to practice, was rehabilitated, and had complied with all disciplinary orders. Of note, the hearing board in that reinstatement case determined that Petitioner failed to file the required wind-up affidavit, did not notify all of his clients or opposing counsel that he had been suspended, and represented clients while suspended. The Hearing Board is deeply troubled that Petitioner's prior disciplinary history is largely premised upon the same type of misconduct that forms the bases of his 2010 and 2013 suspensions—neglecting client matters, failing to communicate and exercise diligence, mishandling client funds, disregarding court orders, and practicing law while suspended. Rather than learning from his past transgressions, he has repeated his pattern of misconduct, and we have serious concerns that he will again engage in similar misconduct if reinstated.

Turning to Petitioner's professional competence and present business pursuits, we do not find clear and convincing evidence that Petitioner has maintained professional competence during his suspension by working at DPS or by listening to expired CLE recordings. In terms of his present business pursuits, Petitioner envisions that he will not return to the practice of law for at least one to three years and desires to continue his employment with DPS. Given Petitioner's financial difficulties and relatively small hourly wage, we do not find this course of action plausible. Thus, it concerns us that he has not described how he would implement safeguards in order to avoid repeating his earlier misconduct if he were to return to the practice of law.

Finally, although Petitioner engaged in substantial community service before his first suspension in 1996, he did not present any evidence that he performed civic, charitable, or community service during his more recent suspensions. Petitioner argues that his positions at DPS, however, satisfy this *Klein* criterion. We do not agree that these paid positions amount to community service, which is typically considered unpaid work with social value.

Considering the totality of the evidence and the testimony presented, the Hearing Board concludes that Petitioner has not proved his rehabilitation by clear and convincing evidence. We do not find that he has taken responsibility for his mistakes or undergone a real and meaningful transformation in his character and state of mind since he was suspended. For these reasons, we cannot find that he is unlikely to repeat his past misconduct.

### Fitness to Practice Law

■ Finally, we examine whether Petitioner is fit to practice law. The People dispute Petitioner's fitness, given that many of the CLEs he completed while suspended were out of date and irrelevant to the areas of law in which he formerly practiced. For his part, Petitioner protests that these efforts, in conjunction with his training through DPS, are enough to demonstrate that he is fit to practice law.

We agree with the People. First, Petitioner did not complete many current CLEs, instead primarily listening to expired home studies and reading self-help books. Petitioner could not state with certainty whether the law discussed in the expired CLEs was current. Further, although inspirational CDs and motivational books may have posi-

---

33. C.R.C.P. 251.29(e).

tive effects upon the listener, they do not build legal competence.

Next, Petitioner testified that he was able to maintain professional competence through his work as a paraprofessional, including by teaching in a special educational setting, reviewing relevant legal requirements, and attending mandatory training sessions. According to Petitioner, his position in DPS also required him to quickly analyze situations—such as whether to restrain a student—and to think about how his actions fit within the proper legal boundaries. He also pointed to his advocacy for students as evidence of his competency. He indicated that he spent many hours counseling his students on their behavior and the consequences of their actions—all skills, stated Petitioner, demonstrative of an effective lawyer. We find, however, that much of Petitioner's on-the-job training is more relevant to his fitness as an educator than to his fitness as an attorney. Accordingly, Petitioner's employment training does not satisfy this requirement of reinstatement.

In sum, the evidence does not make clear that Petitioner has maintained his professional competence, and we conclude that he is not fit to practice law. We have no confidence that Petitioner now has the legal skills, ability to handle client funds, and knowledge necessary to practice law after a five-year absence.

## IV. CONCLUSION

The Hearing Board finds that, taken as a whole, Petitioner has failed to satisfy his burden of showing that he has undergone a genuine change in character that will ensure protection of the public.[34] In fact, we find the opposite. That Petitioner failed to provide written fee agreements, neglected cases, mishandled client funds, disregarded his obligations to notify his clients and opponents of his suspension, and practiced law while suspended—after having been earlier disciplined for this same misconduct—evinced a disregard for his obligations to clients, a disdain

for the Colorado Supreme Court and its regulatory authority over lawyers, and an inability or an unwillingness to play by the rules. He has categorically failed to demonstrate that, since he was last suspended, he has gained any measurable appreciation of the gravity of his misconduct or a genuine desire to reform. We refuse to be a party to what we fear would be a continuance of the pattern of misconduct Petitioner has already established. Therefore, we **DENY** Petitioner's petition for reinstatement.

## V. ORDER

1. The Hearing Board **DENIES** Petitioner's "Petition for Reinstatement." Petitioner **GEORGE C. PRICE**, attorney registration number 10652, **SHALL NOT BE REINSTATED** to the practice of law.

2. Pursuant to C.R.C.P. 251.29(i), Petitioner **SHALL** pay the costs of this proceeding. Petitioner has paid the People a $500.00 cost deposit. The People **SHALL** submit an accounting of the costs of this proceeding to Petitioner **on or before Wednesday, December 16, 2015.** The People **MUST** return any unexpended portion of the cost deposit to Petitioner **on or before Wednesday, December 23, 2015.**

3. Petitioner **MUST** file any posthearing motion with the Hearing Board **on or before Wednesday, December 30, 2015.** Any response thereto **MUST** be filed within seven days.

4. Petitioner has the right to appeal this decision under C.R.C.P. 251.27.

5. Petitioner **SHALL NOT** petition for reinstatement within two years of the date of this order.[35]

---

**34.** See Lawyers' Manual on Prof'l Conduct at 101:3013 ("Throughout the [rehabilitation] inquiry runs an element of 'public qualification, i.e., that reinstatement will not be detrimental to the

integrity and standing of the bar, the administration of justice, or the public interest.' ").

**35.** C.R.C.P. 251.29(g).