Charles Eugene KLINE, Petitioner.

v.

The PEOPLE of the State of Colorado, Respondent.

Nos. 15PDJ052, 15PDJ051.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Jan. 5, 2016.

**OPINION AND DECISION GRANTING REINSTATEMENT FROM DISABILITY INACTIVE STATUS UNDER C.R.C.P. 251.30(b) AND GRANTING REINSTATEMENT FROM DISCIPLINE UNDER C.R.C.P. 251.29(e)**

## I. *PROCEDURAL HISTORY*

Petitioner took the oath of admission and was sworn in to the bar of the Colorado Supreme Court on May 29, 1985, under attorney registration number 14639. On July 7, 2011, Presiding Disciplinary Judge William R. Lucero ("the PDJ") approved an unopposed petition in case number 11PDJ054 to transfer Petitioner to disability inactive status, effective that same day. On June 15, 2012, Petitioner was suspended for three years as a disciplinary sanction in case number 12PDJ026.

Petitioner filed "[Petitioner's] Petition for Order of Reinstatement of License to Practice Law After Transfer to Disability Inactive Status Pursuant to C.R.C.P. 251.30 *et seq.* (Disability)" on July 8, 2015. That matter was assigned case number 15PDJ051. The same day, he also filed "[Petitioner's] Verified Petition for Order of Reinstatement of License to Practice Law After Suspension Pursuant to C.R.C.P. 251.29 *et seq.* (Discipline)." That matter was assigned case number 15PDJ052. Kim E. Ikeler, of the Office of Attorney Regulation Counsel ("the People"), answered both petitions on July 10, 2015. On his own initiative, the PDJ consolidated the two cases on July 28, 2015, with both matters to be heard together in one trial setting by one hearing board. At a scheduling conference held July 29, 2015, the parties agreed that the consolidated proceedings would be treated as public, save for any

material subject to protective orders, which the PDJ pledged to grant liberally when requested.[1] Aside from material subject to protective orders, Petitioner waived any confidentiality surrounding his disability matter.

On November 9, 2015, a Hearing Board comprising Wadi Muhaisen and Jamie J. Roth, members of the bar, and the PDJ held a combined discipline and disability reinstatement hearing. Petitioner appeared pro se, and Ikeler attended on behalf of the People. The Hearing Board heard testimony from Marc Kelly, Leslie Glover, Ellen Kline, Cherie Winnicki, Robert Winnicki, Kimberly Kline, Dietmar Schott, Dr. Gregory Kirk, Arthur Patterson, and Petitioner. The PDJ admitted stipulated exhibits 1–5.

At the hearing, the People acknowledged that no significant evidence suggests that Petitioner will relapse. While they questioned whether a renaissance has taken place in other aspects of his character, they declined to take any position as to whether Petitioner should be reinstated to the practice of law.

## II.  FINDINGS OF FACT

The findings of fact here, aside from that portion describing Petitioner's disciplinary record, are drawn from testimony offered at the reinstatement hearing, where not otherwise noted.

### Events Leading to Petitioner's Suspension

Petitioner was born into a large family headed by an alcoholic father and a mother who, in her own words, "enabled" her husband's drinking. In high school, Petitioner drank heavily, up to eight beers in a night. His alcohol use varied in college and, later, when he attended law school in San Diego. He earned his J.D. in 1984, was admitted to the bar in 1985, and pursued a career in civil litigation, knowing that he wanted to be a solo practitioner. He established his own firm in Longmont, hired a staff, and started a family with his ex-wife, Kimberly Kline, who also worked for him as a paralegal.

Petitioner described his astonishment, once he struck out on his own, at the tremendous amount of freedom he experienced in so many areas of his life. He was his own boss, he called his own shots, and he did as he saw fit, a practice that he carried to an "illogical and unethical extreme." Despite this newfound freedom, Petitioner never was comfortable in his own skin and began to feel hemmed in by an internal compulsion to project an appearance of success. His friend and fellow lawyer Arthur Patterson described him as the guy who wanted "the fanciest car and the biggest office." Kimberly Kline noted that theirs was a lifestyle designed to "keep[ ] up with the Joneses." Without exception, his family members—and at least two of his close friends—described Petitioner before 2011 in pejorative terms: as lacking humility, self-absorbed, standoffish, caustic, arrogant, and more concerned about how things looked than with "the stuff on the inside."

Petitioner explained that though he yearned to achieve success, he could not describe specifically what would constitute its attainment, and he lost direction and perspective in the hunt for ever more money. "I had everything in the world going for me," he recalled, including a lovely wife, two kids, and a beautiful home, "but it wasn't enough, and I don't know if I ever could have found it." There was something elusive he needed, he said, but he could not "put his finger" on what that thing was. To avoid addressing this void in a constructive way, Petitioner turned to alcohol, which "blur[red]" the feeling and "t[ook] care of" the compulsion, at least temporarily.

Petitioner's life thus proceeded along two diverging but linked tracks: on the one, he continued to earn more money, to achieve more material success, and to take on larger financial investments; on the other, he imbibed greater amounts of alcohol with more frequency. Petitioner built a wine cellar and bar in his basement and installed a wet bar in his law office, using alcohol to "manage anxiety and assuage dissatisfactions in his marriage," according to Dr. Gregory Kirk, an expert in addiction psychiatry.

1. Petitioner did not move for, and the PDJ did not issue, any such orders.

Things seemed to come to a head after the financial collapse in 2008. Petitioner had sunk more than one million dollars into a lakeside home, and had invested sizably in the development of several commercial properties, one of which housed his office suite. After the meltdown, Petitioner's tenants could not make rent and moved out; he was left facing the prospect of defaulting on multiple loans. His law practice faltered, and he worried about making payroll for his associates. These stressors, along with marital issues, contributed to his increased dependence on alcohol.

Petitioner began to spiral out of control. As his ex-wife testified, he drank "for good things, for bad things, for everyday average things." He drank himself "into a stupor every night," remembered Robert Winnicki, husband of Cherie Winnicki, one of Petitioner's sisters. Petitioner himself recalled using alcohol "as a medicinal means of achieving a normal existence," resorting to the bottle as a cure for hangovers. Petitioner first moved into a bedroom in his basement, near the bar he had installed, and later moved out of his house and into the Winnickis'. He drank more at work. And he began to deposit client money directly into his operating account, using that money for his own purposes. During that time Petitioner would often wonder, "what is it going to take to stop?," knowing that nothing save a DUI, an accident, or a medical event would get his attention and compel him to reexamine his behavior.

His body gave out before he hurt someone else. On the morning of June 25, 2011, Petitioner woke up and walked to the kitchen. While staring into the refrigerator, he experienced an unexpected sense of warmth. He looked down to find blood streaming down his legs. In the bathroom, he filled a toilet with blood, and then he soaked through towel after towel. Petitioner drove himself to the Longmont United Hospital emergency room, where he was treated for internal hemorrhaging resulting from liver failure. Dr. Kirk explained that Petitioner's drinking had put enormous strain on certain venous areas of his lower gastrointestinal tract, causing them to bleed. This bleeding is consistent with very heavy use of alcohol.

Sedated for much of his ten-day hospital stay, Petitioner suffered from delirium tremens and hallucinations. But around his fifth day in the ICU, Petitioner began to realize how close to death he had come. He also realized that he if chose to live, that choice by its very definition would have to mean a life without alcohol. He told his family, "I choose life." As Petitioner testified, from that day forward he has not deviated from that mantra: since his admission to the hospital, he has maintained sobriety.

On July 5, 2011, Petitioner was released from the hospital after several surgeries, which were not completely successful in staunching his rectal bleeding. He went to convalesce at the home of his mother, Ellen Kline, but his bleeding continued and then worsened. During that time—on July 7, 2011—Petitioner stipulated to transfer to disability inactive status in case number 11PDJ054, acknowledging that he was unable to fulfill his professional responsibilities. Soon thereafter he was admitted to Boulder Community Hospital, where he endured two additional surgeries that finally stopped his bleeding. Back at his mother's house, he took a long time to regain his strength, to begin to walk again, and to monitor his own medications. During that time, Petitioner worked on improving his family relationships and engaged in introspection. He spent a lot of time "alone, soul searching," he says, "asking myself how [ ] anyone in their right mind . . . could allow all of that [good fortune] to slip right through their fingers."

In June 2012, Petitioner stipulated to a three-year suspension in case number 12PDJ026, acknowledging that he had engaged in misconduct in thirteen client matters. Petitioner agreed that he knowingly converted over $45,000.00 in unearned client retainers in violation of Colo. RPC 1.15(a) (2008), which requires a lawyer to keep client funds separate from the lawyer's own property, and Colo. RPC 8.4(c), proscribing conduct involving dishonesty, fraud, deceit, or misrepresentation. Though such conduct normally would have warranted disbarment, Petitioner and the People stipulated that mit-

igating factors should reduce the sanction to a three-year suspension. Specifically, the parties pointed to Petitioner's alcohol dependency and resultant heavy drinking—which almost killed him—as a substantial cause of his misconduct. The stipulation also noted that Petitioner, in cooperation with inventory counsel, eventually repaid all unearned portions of retainers to every affected client.

### Events Since Petitioner's Suspension

Shortly before Petitioner stipulated to his three-year suspension, he voluntarily established with a Colorado hospital a randomized alcohol monitoring program, motivated by the conviction that it was "important to establish a commitment to myself and to the court." From May 2012 through January 2014, Petitioner called the hospital each morning, and at random intervals he was instructed to come into the hospital to blow into a breathalyzer. On every visit his blood alcohol level measured 0.0%.[2] Petitioner also began attending meetings of Colorado Lawyers Helping Lawyers ("CLHL"), a peer assistance and support program for lawyers experiencing problems with alcohol and substance abuse.[3] He testified that it has felt "good to be honest" with other CLHL members and to tell his story.

After Petitioner's suspension took effect, he lived with his mother, Ellen Kline, for a while longer. When Petitioner could not get a loan from the bank, he purchased a car from the Winnickis, and he drafted a contract to memorialize his repayment obligations. He paid off the money with interest before it was due. Petitioner also borrowed money from his mother to recompense the clients he had harmed, money that he is in the process of repaying to her. When the Winnickis moved to Seattle, Petitioner's mother moved there, as well. She trusted Petitioner to contract with workmen on her behalf to refurbish her home, pay the associated bills, sell the property, and move or dispose of her personal belongings. Although Petitioner had an opportunity to be untrustworthy while handling her affairs, she said, he never acted dishonestly with her.

In March 2014, following a lacuna of more than two years in which he appears not to have worked or otherwise earned a livelihood, Petitioner was offered a position as a landman by a natural resources company on the recommendation of his longtime friend Patterson. The position required Petitioner to move to Ohio so that he could serve as a liaison between West Virginia landholders and the company, which was seeking to lease properties for oil and gas extraction and development. Petitioner "brought [the company] out of a really tough period of time," resolved a "backlog" of work, and then started doing title reports under Patterson's supervision, work that, according to Patterson, required a great deal of legal skill. Everyone at the company thought Petitioner did a wonderful job, said Patterson; had the price of oil not plunged, Petitioner would still have a job there today.

When Petitioner moved to Ohio, he worked to establish a new alcohol monitoring relationship with local authorities. He finally convinced the Ohio State Patrol to allow him to stop by its patrol stations occasionally to measure his blood alcohol content. The monitoring was not randomized—Petitioner would simply drop in when he could—but the results consistently showed that Petitioner had not consumed alcohol on the days he visited.[4] Moreover, Patterson testified that he surreptitiously asked locals whether Petitioner had been drinking; not once did anyone report such behavior.

While in Ohio, Petitioner regularly spoke on the telephone with Dietmar Schott, another of Petitioner's friends with whom he had maintained close contact since law school. The two men had ongoing conversations, in particular, about a new project Schott had undertaken to transform the "entire concept" of Legaldocs, a website that enables laypeople to select and prepare personalized legal

---

**2.** Exs. 1–2. Petitioner pointed out that he failed to visit the hospital once when summoned, but he could not recall the circumstances surrounding that failure.

**3.** Exs. 4–5. Petitioner actively participated in weekly CLHL telephone peer support meetings from June 2012 through at least July 2015.

**4.** Ex. 3.

documents and forms. In December 2014, when the oil industry "fell apart" and Petitioner lost his position in Ohio, Schott invited Petitioner to Bandera, Texas, for several weeks to brainstorm and to take a "bigger look" at the website project. In the new year, Petitioner decided to stay in Texas and work full-time, without pay, on the website redesign. As of the date of the hearing, Petitioner was still living in Texas and working with Schott. In Schott's opinion, Petitioner has been integral in developing the site's functionality and its user interface and user experience.

When Petitioner relocated to Texas, he moved into a "cabin in the middle of nowhere," as his ex-wife put it, without access to the internet or other comforts. He then attempted to replicate with Texas law enforcement authorities the type of alcohol monitoring arrangement he had established elsewhere. The Texas authorities received his overtures rather tepidly. The Bandera County Sheriff's Department eventually agreed to administer non-randomized breathalyzer tests, but soon thereafter the department refused to participate, bringing an end to Petitioner's self-imposed alcohol monitoring regime in July 2015.[5]

Meanwhile, Petitioner inquired about the possibility of joining Schott on the board of a local organization committed to improving the welfare of senior citizens in Bandera County. Schott dissuaded Petitioner from doing so because he was not confident that Petitioner would remain in Texas. Schott also recommended that Petitioner avoid regular volunteer commitments while the website was in its nascence, citing too many impromptu business meetings as prohibitive of ongoing community service. Schott recalled, however, that Petitioner occasionally has assisted a local animal adoption agency to walk and socialize animals, and he once drove four hours round-trip to transport an adoptive animal.

During his more than four years away from law practice, Petitioner has worked to repair broken and frayed relationships. When he began his journey toward rehabilitation, he lived with his mother. She said that they ate together, shopped for groceries together, and talked a lot. Their relationship blossomed, she recalled. He also took a trip with the Winnickis at Cherie Winnicki's request; his emotional support and constant presence during that trip built substantial trust between sister and brother that had not existed before. Petitioner also meaningfully reconnected with his ex-wife. They became friends, and they now talk regularly about their former life together and the new life he is crafting in Texas; at the hearing, she noted how humbled he was and how he has learned to live well below his means. He cultivated relationships with his children and began to observe things about them that he would not have noticed while drinking. And he reestablished regular contact with old friends. Without exception, all of Petitioner's witnesses attested that the crucible of his post-hospitalization recovery forged an insightful, compassionate, respectful, thoughtful, peaceful, and temperate man.

These witnesses were even more consistent when discussing Petitioner's relationship with alcohol. Not one witness doubted his commitment to remaining sober, and not one believed he would relapse, as he has regularly confronted—and declined—opportunities for social and solitary drinking. His sister Leslie Glover, who is a nurse practitioner for Veterans Affairs, testified that she holds her brother up as "the gold standard" in maintaining sobriety. Most persuasive, Dr. Kirk, testifying on Petitioner's behalf, opined that Petitioner is in sustained recovery from alcohol dependence, with a current relapse risk of approximately twelve percent. If Petitioner remains sober through June 2016, the statistical chance that he then will relapse will hover around ten percent—the same chance of someone in the general population succumbing to alcohol abuse. According to Dr. Kirk, "there is nothing to complicate [Petitioner's] practice of law as an attorney in Colorado."

### Petitioner's Testimony Regarding His Regeneration

"I'm a new person. I'm a different person. I'm created out of something completely dif-

5. Ex. 3.

ferent," Petitioner testified. His sobriety has been tried and tested, he said, and he is very proud to have maintained his resolve. "My commitment is deep. It is to myself," he explained.

Petitioner also expatiated on the personal transformation he has experienced in the past four and a half years. He learned that he does not need much to live on, and he has adopted the creed "reduce, simplify, and enjoy." He said he hopes to give more, make amends, leave the world a better place, and teach his children about dealing with adversity and loss. His measure of success has shifted from accumulating wealth to "knowing that [his] conscience is clear." His strategy?

> I exercise daily, I wake up happy, I don't need to alter my existence in any way, I enjoy sitting out on my porch, breathing the air, feeding the deer, living the kind of lifestyle that makes me appreciate the frog that's in the grass, and the tree and how it's growing crooked. Things that I never noticed before are now of interest, and that in and by itself is huge.

Petitioner described himself as an attorney by nature and noted that he surrendered his license three years ago with a heavy heart. He wants to get back to the practice of law and finds trial work very fulfilling. But he did not explain whether—or how—he planned to practice law while working at Legaldocs. Moreover, he acknowledged that after living in three states in less than three years, he does not "know where [his] community is." "I've lost my sense of where home is," he stated. He trusts that the outcome of this proceeding will make "clearer" his path forward.

### III. LEGAL ANALYSIS—REINSTATEMENT FROM DISABILITY INACTIVE STATUS

Under C.R.C.P. 251.30, an attorney who has been transferred to disability inactive status and who wishes to resume the practice of law must show by clear and convincing evidence that the attorney's disability has

been removed and that the attorney is competent to practice again.

Dr. Kirk's conclusions, coupled with Petitioner's reported alcohol monitoring and corroborative witness testimony, provide clear and convincing evidence that Petitioner's disability has been removed. Though Petitioner has not availed himself of professional help in a rehab program to address his addiction, he has relied to some extent on outside resources, such as his family and CLHL, to ensure his sobriety. The Hearing Board believes that Petitioner has been sober since he was hospitalized in June 2011. We believe that Petitioner is committed to maintaining his sobriety and has been dedicated to documenting that sobriety, as evidenced by his proactive efforts to establish alcohol monitoring schemes in three jurisdictions that were not all particularly receptive to his requests. And we believe that Petitioner is not likely to relapse.

Based on these findings, it also follows that Petitioner is now competent to resume the practice of law. Petitioner represented clients without incident for more than twenty years before he engaged in misconduct. Moreover, Petitioner ably represented himself at the reinstatement hearing. Finally, as we discuss below, we find that Petitioner has maintained professional competence and is fit to practice law. The People do not dispute, and we conclude, that Petitioner is able to fulfill his professional responsibilities and thus should be removed from disability inactive status.

### IV. LEGAL ANALYSIS—REINSTATEMENT FROM DISCIPLINARY SUSPENSION

To be reinstated to the Colorado bar, an attorney who has been suspended for a period of longer than one year must prove by clear and convincing evidence that the attorney has been rehabilitated, has complied with applicable disciplinary orders and rules, and is fit to practice law.[6] Failure to prove even one requirement is fatal to a petition for reinstatement.[7] In considering Petitioner's

6. C.R.C.P. 251.29(b).

7. *In re Price,* 18 P.3d 185, 189 (Colo.2001).

case, the Hearing Board must review Petitioner's past disciplinary record.[8]

### Compliance with Disciplinary Orders and Rules

■ An attorney petitioning for reinstatement must show compliance with disciplinary orders and the Rules of Professional Conduct. The People acknowledge that Petitioner has met all requirements of his disciplinary suspension and has paid all amounts due. We see no reason to belabor the point: this prong does not stand as an impediment to Petitioner's reinstatement.

### Fitness to Practice Law

■ We next examine whether Petitioner is fit to practice law. Petitioner cites as evidence of his efforts to maintain professional competence only a few items: his law-related employment, his continuing legal education home-study courses, and his monthly review of *The Colorado Lawyer*. The People state that they have no reason to question Petitioner's assertions of fitness, remarking that this proceeding is about character, not competence.

We accord Petitioner's employment as a landman the greatest significance in our analysis. In that ten-month position, Petitioner used interpersonal skills to mollify mineral lessors and tackled complex legal issues to complete title reports. "West Virginia title is not for sissies," Patterson said. "It is horribly difficult." We assign relatively lesser import to Petitioner's current effort to redesign the website of Legaldocs. To us, that endeavor does not merit nearly as much weight in demonstrating his legal competence. Although clearly he is absorbed with what seems to be challenging and rewarding work, neither giving vision to a grand design for a website nor enhancing user interface and experience strike us as drawing on skills, knowledge, or expertise particular to the work of law. We adjudge as weak Petitioner's other statements attesting to his fitness, as they are simply that—statements. He adduced no evidence that he took any con-

tinuing legal education courses, and he did not provide any detail about the number, the type, or the length of the courses that he completed.

Petitioner's presentation on this front is thus less than robust. The most persuasive evidence is Petitioner's landman experience in Ohio and West Virginia, but he occupied that position for less than one-quarter of the total time he has been out of the practice of law. Nevertheless, we find for three reasons that the scales tip in favor of finding that Petitioner met his burden of showing legal competence. First, Petitioner competently represented himself in this proceeding, which involved a delicate balance of advocacy in his role as lawyer and vulnerability and self-revelation in his role as witness. He deftly navigated courtroom procedure and appeared to maintain a respectful relationship with opposing counsel. In short, we were impressed with his poise and technical trial know-how. Second, Kimberly Kline (Petitioner's former paralegal) and Patterson (Petitioner's former legal colleague) agreed that Petitioner was a talented lawyer before his hospitalization but would in the future be an even better lawyer, now that he is sober, even-tempered, and empathetic. Third, we are swayed by the People's judgment that Petitioner is intelligent and their conviction that he will be competent. We decline to second-guess that assessment. Based largely on these reasons, we conclude that Petitioner is fit to practice law.

### Rehabilitation

■ Finally, we turn to whether Petitioner has been rehabilitated. We cannot grant reinstatement simply upon a showing that Petitioner has engaged in proper conduct or refrained from further misconduct. Instead, we must look to whether he has experienced an overwhelming change in his state of mind such that he could be said to have undergone a regeneration.[9] In this analysis, we are guided by the leading case of *People v. Klein*, which enumerates several criteria for evaluating whether Petitioner has

---

8. C.R.C.P. 251.29(e).

9. *See In re Sharpe*, 499 P.2d 406, 409 (Okla. 1972); *In re Cantrell*, 785 P.2d 312, 313 (Okla. 1989).

been rehabilitated.[10] These factors are: character; conduct since the imposition of the original discipline; professional competence; candor and sincerity; recommendations of other witnesses; present business pursuits; personal and community service aspects of Petitioner's life; and recognition of the seriousness of the previous misconduct.[11] The *Klein* criteria provide benchmarks to assess the likelihood that Petitioner will repeat his prior misconduct.

First, we consider together Petitioner's character, his candor and sincerity, and the testimony of other witnesses. Our analysis of Petitioner's character is directed toward determining whether Petitioner has addressed his shortcomings, since the imposition of discipline is necessarily predicated upon a finding of a professional or personal shortcoming, which may have resulted from personal deficits, professional deficits, or environmental challenges.[12]

Petitioner seems to have some difficulty disentangling the geneses of his misconduct; he reckoned that it was a "confluence" of "alcohol, living beyond [his] means, [and] an ego the size of Rhode Island." Dr. Kirk, on the other hand, concluded simply that Petitioner's alcohol abuse is the best explanation for his unethical behavior. We adopt in part the doctor's finding: but for Petitioner's alcohol dependence, he likely would not have exhibited "socially deviant behavior," as Dr. Kirk put it. But we also agree with Petitioner that other shortcomings in his character may have made him more susceptible to alcohol abuse. As Petitioner said, he was never

comfortable in his own skin, and there was something that he "was unable to put [his] finger on in terms of need." Patterson described him as "tortured."

As discussed above, we believe that Petitioner is in sustained remission from alcohol dependence; our confidence in his commitment is further strengthened because he views any relapse as a possible death sentence. As a prophylactic, however, we impose as a condition of Petitioner's reinstatement regular alcohol monitoring until June 2016—the point at which his relapse risk joins that of the general population.[13]

In addition to considering whether Petitioner has been rehabilitated from his alcohol dependence, we also examine whether Petitioner has grappled with his compulsion to live beyond his means, his myopic self-involvement, and his chronic feelings of inadequacy. We believe that Petitioner has effected drastic changes in both outlook and lifestyle. We trust that he has found a new grounding by exploring his emotions, getting to "the bottom" of who he is, and "being true to [him]self." We accept as genuine his declaration that he has become accustomed to living frugally and is no longer highly motivated to amass the trappings of material success. He related all these changes with candor, sincerity, and honesty. Just as important, his witnesses have told the same narrative.

We do have some reservations about Petitioner's financial goals as they relate to his family, however. Petitioner realizes that he has not provided much support to his ex-wife

---

10. 756 P.2d 1013, 1015–16 (Colo.1988) (interpreting language of C.R.C.P. 241.22, which embodied an earlier version of the rule governing reinstatement to the bar).

11. *Id.* at 1016. We note that the *Klein* decision relies upon an earlier version of the *Lawyers' Manual on Professional Conduct* (ABA/BNA) 101:3005, which listed the above factors for assessing the rehabilitation of lawyers seeking reinstatement. The current version of the manual, however, sets forth a number of different factors to consider when evaluating a lawyer's rehabilitation and fitness, including: the seriousness of the original offense, conduct since being disbarred or suspended, acceptance of responsibility, remorse, how much time has elapsed, restitution for any financial injury, maintenance of

requisite legal abilities, and the circumstances of the original misconduct, including the same mitigating factors that were considered the first time around. *Id.* at 101:3013. While some of these newly articulated factors are encompassed in our analysis, we do not explicitly rely on them to establish a framework for our analysis.

12. *See Tardiff v. State Bar*, 27 Cal.3d 395, 165 Cal.Rptr. 829, 612 P.2d 919, 923 (1980) (considering a petitioner's character in light of the moral shortcomings that resulted in the imposition of discipline).

13. Although an order reinstating an attorney to the bar may include conditions, it is a prerequisite to any such order that the attorney has already been rehabilitated. C.R.C.P. 251.29(b).

and their two children for several years; at one point while he questioned his ex-wife, he alluded to some future time "when I have redeemed myself financially." Though we doubt that Petitioner would again dishonestly deal with client funds to take care of his family, we establish monitoring conditions on Petitioner's reinstatement, outlined below, to ensure that he develops a law practice responsibly, without undue haste or unrealistic commitments.

We now turn to Petitioner's conduct since the imposition of his original discipline and the personal and community service aspects of his life. These are the elements that cause the People to question whether Petitioner has completed the regeneration that is required for reinstatement. Noting that Petitioner has not participated in any sustained, meaningful community service or public outreach, the People suggest that although Petitioner has engaged in introspection and has mended familial bonds, he has not completed the full circle by moving his gaze outward to his community. His is a very insular focus, they say.

We tend to agree with the People that Petitioner's limited record of civic involvement and community outreach is underwhelming. We certainly would have preferred to see some more compelling evidence of his purported desire to leave others better off because of their contact with him. Still, we cannot ignore the very positive changes Petitioner has wrought in his personal life. He honestly dealt with his mother's finances and honorably performed his filial duties. He has become the "go-to person" for many of his siblings, someone in whom they trust. His family members believe that he acts to promote their best interests and that he is concerned about their well-being. This approach appears to have edged its way into his CLHL relationships; he mentioned that his perspective as a senior member of the CLHL virtual community is valuable to law students and young attorneys, who can learn from his "dramatic fall."

Thus, while we agree with the People that Petitioner's attitude is still relatively inward-looking, we do see a gradual broadening of his perspective. Moreover, we cannot in good conscience hold up his reinstatement on just this one factor, since overall we conclude that Petitioner has been rehabilitated both in conduct and in character. Better to nudge Petitioner forward using his own momentum by conditioning his reinstatement on performance of community service, we think, than to deny his petition outright. After all, the law favors the regeneration of erring attorneys and should not place unnecessary burdens upon them.[14]

## V. *CONCLUSION*

The Hearing Board is convinced that Petitioner should be removed from disability inactive status; his more than four years of sobriety stands as a testament to his commitment to living a life without alcohol. We are also convinced that Petitioner should be reinstated from his disciplinary suspension; his newfound resolve to lead a more simple, healthy, peaceful, and empathetic lifestyle provides clear evidence of his rehabilitation from the deficits in his character that contributed to his misconduct.

## VI. *ORDER*

1. The Hearing Board **GRANTS** Petitioner's petition for transfer from disability inactive status under C.R.C.P. 251.30. The Hearing Board also **GRANTS** Petitioner's petition for reinstatement under C.R.C.P. 251.29. Petitioner **CHARLES EUGENE KLINE, Attorney Registration Number 14639,** is **REMOVED** from disability inactive status and is **REINSTATED** to the practice of law, effective immediately.

2. Pursuant to C.R.C.P. 251.29(i), Petitioner **SHALL** pay the costs of this proceeding. Petitioner has paid the People a $500.00 cost deposit. The People **SHALL** submit a statement of costs **on or before Tuesday, January 19, 2016.** Petitioner **MUST** file his response to the People's statement of costs, if any, **within 7 days thereafter.** The PDJ will then issue an order es-

14. *Resner v. State Bar of Cal.,* 67 Cal.2d 799, 63 Cal.Rptr. 740, 433 P.2d 748, 755–56 (1967).

tablishing the amount of costs to be paid or refunded and a deadline for the payment or refund.

3. The parties **MUST** file any posthearing motions with the Hearing Board **on or before Tuesday, January 26, 2016.** Any responses thereto **MUST** be filed **within 7 days thereafter.**

4. Petitioner **SHALL** comply with following conditions of reinstatement:

    A. Until July 5, 2016, Petitioner shall participate in a fully randomized alcohol monitoring program at a frequency of twice a month. Petitioner must provide a copy of this opinion to the monitor and execute an authorization for release of Petitioner's information to the People. The monitor must notify the People if Petitioner fails to fully participate in the required monitoring. The monitor must submit regular reports to the People during the monitoring period. Petitioner must bear all costs of complying with this condition of reinstatement.

    B. Petitioner shall engage in fifty hours of community service and outreach by December 31, 2016, through public speaking or other volunteer opportunities, preferably those designed to increase community awareness about the harms and dangers associated with excessive alcohol consumption and drinking and driving.

    C. Unless Petitioner works as in-house counsel, or as lawyer for a governmental or non-profit entity, or is employed in a capacity in which he does not represent clients, he must consult every two months with a practice monitor selected jointly by the People and Petitioner. This monitoring requirement will take effect upon Petitioner beginning work as a lawyer in private practice; regardless of the effective date, the requirement will terminate two years from the reinstatement of Petitioner's license. The monitoring will be designed to implement and

consistently employ effective systems for financial and trust account management, workload management, and regular communication with clients. Each monitoring session must include reviews of Petitioner's business and trust accounts, his overall caseload, and his client files, selected at random. Within twenty-eight days of Petitioner beginning work as a lawyer in private practice, Petitioner and the People must submit a joint monitoring plan for approval by the PDJ, Petitioner must provide a copy of this opinion to the monitor, and Petitioner must execute an authorization for release of Petitioner's information to the People. The monitor must notify the People if Petitioner fails to fully participate in the required monitoring. The monitor must submit regular reports to the People during the monitoring period. Petitioner must bear all costs of complying with this condition of reinstatement.